**SMITH KRIVOSHEY, PC**
Yeremey O. Krivoshey (State Bar No. 295032)
28 Geary Street, Ste. 650 # 1507
San Francisco, CA 94108
Phone: 415-839-7000
E-Mail:  yeremey@skclassactions.com

**SMITH KRIVOSHEY, PC**
Joel D. Smith (State Bar No. 244902)
867 Boylston Street, 5th Floor, Ste. 1520
Boston, MA 02116
Phone: 617-377-7404
E-Mail: joel@skclassactions.com

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMIT PATEL, LAUREN SCHMIDT, and CHRISTOPHER NUNEZ on Behalf of Themselves and all Others Similarly Situated,<br><br>      Plaintiffs,<br>  v.<br><br>GT'S LIVING FOODS, LLC.,<br><br>      Defendant. | Mis. Case No.  3:26-mc-80036-TSH<br><br>(CASE NO. 2:19-cv-10920-FMO-GJS Pending in the Central District of California)<br><br>**REPLY BRIEF IN SUPPORT OF MOTION FOR SANCTIONS AGAINST DEFENDANT GT'S LIVING FOODS, DAVIS, WRIGHT, TREMAINE, AND ATTORNEYS JACOB HARPER AND JOSEPH ELIE-MEYERS.**<br><br>Date: April 2, 2026<br>Time: 10:00 a.m.<br>Judge: Hon. Thomas S. Hixson |

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION AND SUMMARY OF ARGUMENTS.................................................1

II.   ARGUMENT ................................................................................................................2

      A.   Statements In The Opposition Brief Further Support Sanctions ...............................2

           1.   The Opposition Brief Confirms That The Subpoena Was
                Based On Speculation That Contradicted The Evidence ..............................2

           2.   The Supporting Declaration Of Mr. Elie-Meyers Includes
                Damaging Admissions And Contradictory Statements ................................4

      B.   Defendant's Arguments Against Sanctions Lack Merit.............................................6

           1.   Defendant's Excuse For Not Seeking Discovery From The
                *Patel* Plaintiffs Lacks Merit..............................................................6

           2.   Defendant's Excuse That There Was An "Ordinary Discovery
                Disagreement" About The Scope Of Discovery Lacks Merit ......................7

           3.   Defendant's Excuse That It "Offered To Extend The
                Subpoena's Compliance Deadline" Lacks Merit .........................................9

           4.   Defendant's Excuse That The Subpoena "Substantially
                Complied" With Rule 45 Lacks Merit.............................................9

           5.   Defendant's Excuse That Rule 45 Does Not Support
                Sanctions Lacks Merit ........................................................................11

           6.   Defendant's Excuse That The Non-Parties Purportedly Failed
                To Negotiate In Good Faith Lacks Merit .......................................11

III.  ADDENDUM RESPONDING TO DEFENDANT'S MISSTATEMENTS
      CONCERNING PRIOR LITIGATION .............................................................12

IV.   CONCLUSION .................................................................................................15

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*BBK Tobacco & Foods, LLP v. Central Coast Agriculture, Inc.*,
   2021 WL 5507167 (N.D. Cal. Nov. 21, 2021)............................................................... 10, 11

*Bierk v. Tango Mobile, LLC*,
   2021 WL 1837376 (N.D. Ill. May 7, 2021) ...................................................................... 9

*Chima v. U.S. Dep't of Def.*,
   23 F. App'x 721 (9th Cir. 2001) ...................................................................................... 10

*City of Baton Rouge/Parish of E. Baton Rouge Dep't. of Finance v. Centroplex Centre
   Convention Hotel, LLC*,
   2022 WL 17682645 (M.D. La. Dec. 14, 2022)................................................................. 9

*Doung v. Groundhog Enter's, Inc.*,
   2020 WL 2041939 (C.D. Cal. Feb. 28, 2020)........................................................ 2, 4, 11

*Hawkins v. Kroger Co.*,
   2020 WL 6150040 (S.D. Cal. Oct. 20, 2020) ................................................................. 7

*In re Citric Acid Litig.*,
   191 F.3d 1090 (9th Cir. 1999)......................................................................................... 6

*JH Kelly, LLC v. AECOM Tech. Servs., Inc.*,
   660 F. Supp. 3d 840 (N.D. Cal. 2022) ............................................................................ 3

*Legal Voice v. Stormans Inc.*,
   738 F.3d 1178 (9th Cir. 2013)......................................................................................... 9

*LegalZoom.com v. Rocket Lawyer Inc.*,
   2015 WL 12832823 (N.D. Cal. Mar. 23, 2015)............................................................... 7

*Netlist, Inc. v. Montage Tech., Inc.*,
   2023 WL 2940043 (N.D. Cal. Feb. 24, 2023)................................................................. 10

*Oros v. Automattic, Inc.*,
   2023 WL 7496223 (N.D. Cal. Oct. 4, 2023).................................................................... 10

*Perez-Encinas v. AmerUs Life Ins. Co.*,
   468 F. Supp. 2d 1127 (N.D. Cal. 2006) .......................................................................... 3

*Pete v. Facebook Data Breach*,
   2026 WL 32635 (N.D. Cal. Jan. 6, 2026) ...................................................................... 11

*Rembrandt Patent Innovations v. Apple, Inc.*,
    2015 WL 4393581 (W.D. Tex. July 15, 2015) ................................................................................ 7

*Retta v. Millennium Prods., Inc.*,
    2017 WL 5479637 (C.D. Cal. Aug. 22, 2017) ........................................................................ 13, 15

*Scientific Applications & Research Assocs. (SARA), Inc. v. Zipline Int'l., Inc.*,
    2024 WL 5011603 (N.D. Cal. Dec. 6, 2024) ................................................................................ 11

*Scott v. Ventura*,
    2025 WL 3473767 (N.D. Cal. Dec. 3, 2025) ................................................................................ 10

*Varlitskiy v. Cnty. of Riverside*,
    2022 WL 18284986 (C.D. Cal. Dec. 14, 2022) .............................................................................. 8

*XTO Energy, Inc. v. ATD, LLC*,
    2016 WL 1730171 (D.N.M. Apr. 1, 2016) ...................................................................................... 6

**Statutes**

28 U.S.C. § 1927 ............................................................................................................................. 11

**Rules**

Cal. Rule of Court 9.7(a) ................................................................................................................... 9

**Regulations**

27 C.F.R. § 16.21 ............................................................................................................................. 13

**Other Authorities**

9A *Fed. Prac. & Proc. Civ.* § 2454 (3d ed.) .................................................................................. 10

## I.    Introduction And Summary Of Arguments

Four things about the opposition brief confirm that corrective action by the Court is warranted here. First, and most importantly, Defendant cites no evidence that Mr. Krivoshey continued to be involved in the *Patel* matter after he withdrew from the matter in 2024—which was the entire basis for the subpoena. Instead, Defendant admits that the evidence showed Mr. Krivoshey's *lack* of involvement. Defendant chose not to take that evidence "at face value" because it contradicted an accusation that Defendant had first made against Mr. Krivoshey in 2024. That is reckless.

Second, throughout the opposition brief, Defendant denigrates Mr. Krivoshey and Dovel & Luner ("Dovel"), as if its accusations justify what happened here.[1] Defendant's counsel goes so far as to blame the Non-Parties for his *own* lack of candor during the meet and confer process, and then proceeds to make contradictory statements in his Declaration. *See* Decl. of Elie-Meyers, ¶ 12 (stating his view that "candid negotiations" were "all but futile"). When one cuts through the noise, however, there are numerous facts cited in the opening brief that Defendant does not dispute. Instead, Defendant offers a long series of excuses, often coupled with half-truths that are contradicted by the record. This is evidence of bad faith and recklessness.

Third, Defendant concedes that all information it sought from Non-Parties *was*, in fact, obtained from *Patel* counsel within a matter of days of asking *Patel* counsel for a declaration. Defendant had no basis for intentionally attempting to obtain this information from Non-Parties *first*, and then misleading Non-Parties about the order and timing of discovery.

Fourth, as set out in the March 10, 2026, Order in *Patel*, Defendant's arguments based on the scheduling order in *Patel* are baseless and contradicted by its own statements. *See* Ex. 1 to Smith Decl. ISO Reply Brief (*Patel* Dkt. 200). Magistrate Judge Roberts criticized Defendant for making arguments based on the scheduling order that it "<u>knew</u>" were wrong. *Id*., at 5 (underlining in original); *see also id*. at 6 ("Defendant knows this"); *id*. at 4 ("Defendant argues that Plaintiff's timeliness argument is based on 'misplaced reliance on the District Court's March 20, 2020, Scheduling and

---

[1] Defendant's attacks on Mr. Krivoshey include several incorrect statements concerning the *Patel* matter and prior matters against the Defendant. Although those statements are irrelevant, this brief concludes with a short factual addendum correcting the record.

Case Management Order.' The Court does not see how reliance on the District Judge's Scheduling and Case Management Order can be 'misplaced.' A scheduling order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril.") (cleaned up).

## II.    Argument

### A.    Statements In The Opposition Brief Further Support Sanctions

#### 1.    The Opposition Brief Confirms That The Subpoena Was Based On Speculation That Contradicted The Evidence

Pursuing a subpoena based on "nothing more than speculation" and unsupported accusations warrants sanctions. *See Doung v. Groundhog Enter's, Inc.*, 2020 WL 2041939 at *10 (C.D. Cal. Feb. 28, 2020). Defendant's opposition confirms that is precisely what happened here.

Defendant states that the subpoena was necessary due to a "plausible concern" that Mr. Krivoshey "continued to direct and stand to profit from the litigation" in the *Patel* matter. Opp'n Brf., 1:19-24. Defendant then states that the *Patel* plaintiffs "raised issues" about Mr. Krivoshey's "ongoing involvement," as if to suggest that the subpoena to Mr. Krivoshey was prompted by new discovery obtained in the *Patel* matter. *Id.* at 5:6. That is false. For one thing, the *Patel* plaintiffs uniformly testified that they had no knowledge of Mr. Krivoshey's involvement, and Defendant does not contend otherwise. *See* Opp'n Brf., 6:10-19. For another, Defendant does not deny that it first raised its accusation against Mr. Krivoshey in 2024, and so the supposedly "plausible concern" arose long before the *Patel* plaintiffs appeared in the case. *Compare* Dkt. 9-1 ("Krivoshey Decl."), ¶ 11 (Dkt. 9-1) (describing accusation made in 2024) *with* Dkt. 10-1 (Harper Decl.), ¶¶ 1-3 (not denying Mr. Krivoshey's testimony concerning the 2024 accusation).

The only evidence Defendant cites are the two agreements described in the Non-Parties' opening brief, but those do not support Defendant's position either. As already disclosed in the opening brief, the first agreement executed in July 2024 included a fee-sharing agreement and contemplated the Non-Parties' continued involvement. Defendant admits, however, that *one week later*, the Non-Parties and Dovel signed a new agreement that "*broadly stated it superseded*" the first one. Opp'n Brf., 13:2 (addressing second contract; emphasis added); *accord* Krivoshey Decl., ¶ 7; *see also* Ex. 1 to Dkt. 10-2 ("Elie-Meyers Decl.") (attaching agreements). Defendant also does not

deny that the second agreement (a) expressly provided that Dovel "would take control over the litigation" and serve as "sole lead counsel"; and (b) permitted the Non-Parties to seek payment only via court approval. Krivoshey Decl., ¶ 7; *see also* second agreement attached as Ex. 1 to Elie-Meyers Decl. And, there is no dispute that Mr. Krivoshey withdrew from *Patel* shortly after executing the second agreement. *See id.* at ¶ 8; *Patel* Dkt. No. 141. Defendant cites no evidence that Mr. Krivoshey played *any* role thereafter. These facts were either already known to Defendant or available from the *Patel* plaintiffs, and they contradict the entire justification for the subpoena.

Defendant says it was not required to accept the terms of the second agreement "at face value" because it believes "Mr. Krivoshey's proffered interpretation of the contract" does not really answer "who is driving the litigation" or whether the Non-Parties have a financial interest outside the agreements. Opp'n Brf., 13:3-11. But contracts are interpreted according to their "plain terms,"[2] and "[c]ourts will not strain to create an ambiguity where none exists." *Perez-Encinas v. AmerUs Life Ins. Co.*, 468 F. Supp. 2d 1127, 1133 (N.D. Cal. 2006) (applying California law). Defendant cites no extrinsic evidence that the second agreement is a sham, or that the parties interpreted the words to mean anything other than what they say. Just as the contract said, Mr. Krivoshey withdrew, while Dovel is sole lead counsel.

Defendant also claims that the agreements it obtained from the *Patel* plaintiffs were "incomplete versions," implying there are undisclosed sections or terms that "implicate" Mr. Krivoshey's "possible ongoing involvement in *Patel*." Opp'n Brf., 12:1-3. That is a misleading statement. To start, the only reason Defendant says the agreements were "incomplete" is that they were not signed by the *Patel* plaintiffs, who were not involved until four months *after* Mr. Krivoshey withdrew from the case. *See id.* at 6:12-19; 12:5-9, 25-27. But the evidence confirms Defendant *did* receive full copies of the agreements that had been signed by all counsel as of July 2024, before Mr. Krivoshey withdrew. *See* Ex. O to Krivoshey Decl., ¶¶ 17-18 (stating executed versions of the agreements had been produced); Ex. 1 to Elie-Meyers Decl. (attaching agreements).

Defendant also fails to disclose to the Court that when the dispute over the subpoena arose

---

[2] *E.g. JH Kelly, LLC v. AECOM Tech. Servs., Inc.*, 660 F. Supp. 3d 840, 852 (N.D. Cal. 2022).

here, Defendant was *already* moving to compel "complete" signed versions of the agreements from the *Patel* plaintiffs. *See* Ex. S to Krivoshey Decl., 1:22-26 ("GT's now moves to compel the production of … the *executed* agreements (if they exist) between current- and former counsel governing the joint prosecution of this action and fee sharing and recovery") (emphasis in original) (Dkt. 9-20). So, even if the agreements were "incomplete," that does not justify Defendant's behavior because Defendant was already in the process of obtaining copies signed by the *Patel* plaintiffs. Defendant never explains why the Non-Parties might have copies of agreements signed by the *Patel* plaintiffs, but the *Patel* plaintiffs would not. And, as it turns out, Defendant's motion to compel was itself untimely and violated the scheduling order in *Patel*. Smith Decl., Ex. 1.

To sum up, the uncontroverted evidence shows that in 2024, and without any evidence, Defendant and its counsel first developed their theory about Mr. Krivoshey's supposed continued involvement in the *Patel* matter after he withdrew. They then pressed forward on their subpoena even though all evidence contradicted that theory. The record also shows that the sole justification for the subpoena given in Defendant's opposition brief (*i.e.*, the purportedly "incomplete" agreements) is a pretext. Sanctions are warranted under *Doung*. *See Doung*, 2020 WL 2041939 at *10.

### 2. The Supporting Declaration Of Mr. Elie-Meyers Includes Damaging Admissions And Contradictory Statements

The Non-Parties' opening brief discusses misrepresentations made by Mr. Elie-Meyers on the February 9, 2026, meet and confer call. Opening Brf., 10-13. Mr. Elie-Meyers admits or does not contest most of the salient facts. *Compare* Krivoshey Decl., ¶¶ 25-40, *with* Elie-Meyers Decl., ¶¶ 10-14. In framing his approach to the meet and confer call, Mr. Elie-Meyers believed that "candid negotiation[s] [were] all but futile." Elie-Meyers Decl., ¶ 12:17. Mr. Elie-Meyers was even purportedly concerned that Mr. Krivoshey may "impute to [Mr. Elie-Meyers] a lack of candor." *Id*. at ¶ 13:24-25.

In Paragraph 14 of his Declaration, Mr. Elie-Meyers makes two damaging statements that are evidence of lack of candor and bad faith. He admits that Non-Parties asked him which deposition was scheduled first, Mr. Krivoshey's or Dovel's. *Id*. ¶ 14. Mr. Elie-Meyers then admits that he "neglected to mention that Dovel's noticed deposition date" had been rescheduled to occur

after Mr. Krivoshey's deposition at the time of the call. *Id.* He attempts to justify this omission by stating that he informed the Non-Parties that the order of depositions was "irrelevant," which shows that the omission was not a mere oversight because it pertained to one of the main objections that the Non-Parties raised on the meet and confer call. *See id.*

Mr. Elie-Meyers also contradicts himself on this issue. One the one hand, he states under oath that he told the Non-Parties that he could not "definitively know" "which documents might be in [the Non-Parties'] possession that were not in the possession of Dovel" "until after Dovel's deposition." *Id.* Indeed, Mr. Elie-Meyers justified purportedly proceeding with Dovel first so that he "would be in a better position to know what, if any, [information Mr. Krivoshey] may possess that Dovel & Luner does not possess." Krivoshey Decl., ¶ 34. But on the other hand, he also admits in Paragraph 14 that he knew at the time that the Dovel "had subsequently been rescheduled as a result of meet-and-confer efforts," and so he knew that Defendant would not obtain documents from Dovel before Mr. Krivoshey's February 18, 2026 deposition. *Id.*

Mr. Elie-Meyers also says he believes the subpoena sought information within the boundaries of reopened discovery period, justifying his failure to tell Non-Parties that discovery was limited to the *Patel* plaintiffs only, and purportedly "accurately stat[ing] that discovery closed on March 5, 2026." Elie-Meyers Decl., ¶ 13. As is clear from Magistrate Judge Robert's recent ruling, however, by the time Defendant served the subpoenas, and at the time of the meet and confer call, Defendant "knew" that it was impossible to timely hear any disputes about discovery by the March 5, 2026 discovery cut-off. The Non-Parties' objections to the subpoena were not due until February 18, 2026, less than 21 days prior to March 5, 2026. A discovery motion must be made at least 21 days prior to a hearing on a motion to compel in the Central District of California, and 35 days prior to a hearing in the Northern District of California. Despite knowing that it was impossible to comply with the March 5, 2026 cut-off, Defendant still opposed Non-Parties' request to hear the motion to quash on shortened time, which would have allowed this Court to hear Non-Parties' concerns about the subpoena within the March 5, 2026 deadline. Instead, Defendant tried to have any disputes about the subpoena heard after the discovery cut-off.

### B.    Defendant's Arguments Against Sanctions Lack Merit

#### 1.    Defendant's Excuse For Not Seeking Discovery From The *Patel* Plaintiffs Lacks Merit

Apart from the agreements already addressed in Section A above, Defendant also subpoenaed the Non-Parties for every communication exchanged between them and Dovel (which would include the entire case file up to summer 2024), and Mr. Krivoshey's testimony concerning his role in the *Patel* matter.[3] Defendant says it was "not obligated" to seek that evidence from the *Patel* Plaintiffs first because they sought information that only the attorneys would have, and Dovel is a "non-party to the action." *See* Opp'n Brf., 14:8-13; 22:11-12; *see also id.* at 13:24 (stating that the subpoena "requested communications or documents exchanged between former and present counsel, which the new plaintiffs would not possess."). Hence, in Defendant's view, it was free to target Mr. Krivoshey *first*. That is meritless.

Any responsive documents or information in Dovel's possession concerning the *Patel* matter would be part of the *Patel* case file, and therefore, within the *Patel* plaintiff's custody and control. *See* Cal. R. Prof. Conduct 3-700(D)(1) (defining "client papers and property" as correspondence and other documents that are part of the case file); *In re Citric Acid Litig.*, 191 F.3d 1090, 1108 (9th Cir. 1999) ("Control is defined as the legal right to obtain documents upon demand."). Put another way, "[b]ecause a client has the right to obtain copies of documents gathered or created by its attorneys pursuant to their representation of that client, such documents are clearly within the client's control." *XTO Energy, Inc. v. ATD, LLC*, 2016 WL 1730171 at *24 (D.N.M. Apr. 1, 2016) (collecting authorities; internal quotation and emphasis omitted).

The same principle holds true regarding Mr. Krivoshey's testimony, because an interrogatory or request for admission to the *Patel* plaintiffs asking whether Mr. Krivoshey continued to be involved the matter would have revealed the same information that Defendant sought via its subpoena. And Defendant admits that ultimately it *did* obtain the information it was seeking from *Patel* plaintiffs' counsel. *See* Opp'n Brf., 14:18 ("Dovel … agreed to provide sworn declarations").

---

[3] The putative subjects of the deposition were not disclosed in the subpoena or during the meet and confer call, but the Non-Parties base this statement on representations made in Defendant's opposition brief.

The record also shows that Defendant's statement that it "exhausted" relevant discovery from the *Patel* plaintiffs is not true. *See* Opp'n Brf., 6:21-22. Defendant admits in its opposition brief that it never asked Dovel to provide a sworn statement concerning Mr. Krivoshey's lack of involvement in *Patel* until *after* Non-Parties were forced to file the motion to quash. *See* Opp'n Brf., 14:13-15 ("GT's requested that nonparties Dovel and Bursor provide sworn declarations describing their relationship with former counsel in the *Patel* litigation *after Mr. Krivoshey submitted his own declaration stating the same*.") (emphasis added). Further, Defendant never tried to obtain communications between Non-Parties and Dovel from the *Patel* plaintiffs first. It also appears that Defendant never served an interrogatory, request for production, or request for admission asking about the Non-Parties' involvement, or lack thereof. Its motion to compel in *Patel* did not seek this information.

Finally, there is no real legal dispute that Defendant was required to make a genuine effort to obtain this information from the *Patel* plaintiffs. *See e.g.*, *LegalZoom.com v. Rocket Lawyer Inc.*, 2015 WL 12832823, at *2 (N.D. Cal. Mar. 23, 2015) ("LegalZoom has not specified the parameters of the 'gaps' that Google [the subpoenaed party] needs to fill"); *Rembrandt Patent Innovations v. Apple, Inc.*, 2015 WL 4393581, at *2 (W.D. Tex. July 15, 2015) (holding subpoena issued to non-party is unduly burdensome "until and unless Petitioners can establish they are unable to obtain the requested information from the Respondent").

### 2.      Defendant's Excuse That There Was An "Ordinary Discovery Disagreement" About The Scope Of Discovery Lacks Merit

Defendant states that its failure to disclose that the March 5, 2026, discovery deadline was limited to the newly added plaintiffs was the result of a "good-faith disagreement about discovery scope." Opp'n Brf., 21:9. Similar to Defendant's counsel's conduct in *Hawkins* and in *Patel*, it appears that Defendant is relying on a feigned ambiguity about whether the court-ordered deadline would extend to cover the subpoena at issue here. *Cf. Hawkins v. Kroger Co.*, 2020 WL 6150040 at *6-7 (S.D. Cal. Oct. 20, 2020) (rejecting argument by Defendant's counsel that it did not act in bad faith due to a purportedly ambiguous discovery deadline); Smith Decl., Ex. 1, *Patel*, Dkt. 200 (criticizing Defendant for making arguments about the scheduling order that it "knew" were wrong)

(underlining in original). There was no "good faith" disagreement about discovery scope here.

First, recall that it is undisputed that Defendant first raised its accusations about Mr. Krivoshey's supposed continued involvement in the *Patel* matter in 2024. *See* Krivoshey Decl., ¶ 11. The following year, when Defendant requested two extensions of the deadline for "limited" plaintiff discovery, Defendant never told the district court in *Patel* that it intended to seek any third-party discovery, much less serve subpoenas *on every counsel who ever represented current and former plaintiffs over the last six years*. Instead, Defendant repeatedly represented that the extensions were necessary to "take depositions of the newly-named Plaintiffs after allowing sufficient time for review the Plaintiffs' written discovery responses in advance of their depositions," to "review prior discovery productions" from the Plaintiffs, and to accommodate "Plaintiffs' unavailability during the week of Christmas." Ex. L to Krivoshey Decl., 2:27-1; 3:8 Dkt. 9-13); Ex. M to Krivoshey Decl., 1:12: 2:10-11 (Dkt. 9-14). Defendant either never intended the discovery extension to extend to former attorneys on the case, or it did not disclose that fact from the *Patel* court.

Second, Defendant contends that the subpoena fell within the scope of limited discovery because it is "directly related to the new plaintiffs" inasmuch as it sought to "clarify who is directing, or has a financial interest in, the representation of new class plaintiffs." Opp'n Brf., 18:27-19:1. But as shown in Section III.A above, there was no evidence requiring "clarification" about Mr. Krivoshey's lack of involvement with the new *Patel* plaintiffs. Defendant simply did not like the evidence it obtained because it did not support the accusation against Mr. Krivoshey that Defendant had made in 2024. In any event, all it took to obtain the clarity was a declaration from the *Patel* plaintiffs' counsel, which further shows that information sought was available from the parties all along. *See* Opp'n Brf., 9:5-7; 14:18 (describing declaration from Dovel).

The sole authority Defendant cites on this issue, *Varlitskiy v. Cnty. of Riverside*, 2022 WL 18284986, at *4 (C.D. Cal. Dec. 14, 2022), does not support Defendant's position. Unlike here, the subpoenaing party sought the testimony of a former defendant. The court explained that "at least one" of the current defendants indicated the information sought may be in the control of the former defendant, and that this was information that the plaintiff "lacked a full chance to obtain earlier." *Id.* at 4. Those are not the facts here.

### 3. Defendant's Excuse That It "Offered To Extend The Subpoena's Compliance Deadline" Lacks Merit

One of the factors supporting sanctions here is that Defendant refused to extend the February 18, 2026, subpoena compliance date, and refused to shorten the time on which the Non-Parties' motion to quash could be heard, thereby insisting that the deposition proceed before a hearing on the pending motion to quash. Defendant claims it "offered to extend the subpoena's compliance deadline," but also admits that the offer was contingent on "the *Patel* plaintiffs' current counsel's agreement to extend the approaching March 5 discovery deadline." Opp'n Brf., 15:14-15. Defendant does not explain how or why the Non-Parties would have any control over that issue. In turn, Defendant needed *Patel* counsel's consent because the subpoenas were served outside the limitations of the scheduling order in that case and were untimely. *See generally* Ex. 1 (order denying motion to compel).

Defendant also attempts to justify this behavior by suggesting that a notice period of 10-14 days is presumptively reasonable. *See* Opp'n Brf., 23:20-23. The 14-day period in Rule 45 is a general "benchmark for compliance,"[4] but it does not allow a noticing party to ignore basic courtesies required under state bar or judicial civility and professionalism guidelines. *See*, *e.g.*, Cal. Rule of Court 9.7(a); ABA Model Rule 3.4; N.D. Cal. Standing Order on Civility and Professionalism.

### 4. Defendant's Excuse That The Subpoena "Substantially Complied" With Rule 45 Lacks Merit

Defendant does not dispute that "a facially defective subpoena" is one of three grounds for sanctions. *See Legal Voice v. Stormans Inc*., 738 F.3d 1178, 1185 (9th Cir. 2013). In their opening brief, the Non-Parties argued that the "combination" of defects concerning lack of notice, improper service, ambiguity about the recipient, and fees supported an inference of bad faith and recklessness, especially in light of other more serious problems concerning the failure to seek information from the *Patel* plaintiffs, the close of discovery, and the refusal to continue the compliance date. *See*

---

[4] *Bierk v. Tango Mobile, LLC*, 2021 WL 1837376 at *1 (N.D. Ill. May 7, 2021); *see also City of Baton Rouge/Parish of E. Baton Rouge Dep't. of Finance v. Centroplex Centre Convention Hotel, LLC*, 2022 WL 17682645 at *1 (M.D. La. Dec. 14, 2022) (explaining that what constitutes a reasonable time for compliance "depends on the circumstances" and that more than 14 days may be unreasonable).

Opening Brf., 18:24-19:5 (Dkt. 9). Defendant does not respond to that argument; instead, it parses out the procedural defects one-by-one, while ignoring the bigger picture issue raised in the Non-Parties' opening brief. Two of Defendant's arguments stand out as particularly meritless.

First, Defendant argues that even though the second subpoena was intended to be directed at Mr. Krivoshey personally, no personal service of the subpoena was necessary. That is wrong. "[M]ost district courts agree that 'delivering' requires personal service [of a subpoena]." *Netlist, Inc. v. Montage Tech., Inc.,* 2023 WL 2940043, at *2 (N.D. Cal. Feb. 24, 2023) (DeMarchi, J.); *see also*, *e.g.*, *Chima v. U.S. Dep't of Def.*, 23 F. App'x 721, 724 (9th Cir. 2001) (holding that service by mail rather than by personal service of subpoenas duces tecum on defense witnesses was improper); *Scott v. Ventura*, 2025 WL 3473767, at *1 (N.D. Cal. Dec. 3, 2025) (Gilliam, J.) ("personal service of a subpoena duces tecum is required"); *Oros v. Automattic, Inc.*, 2023 WL 7496223, at *1 (N.D. Cal. Oct. 4, 2023) (Cisneros, J.) ("serving a subpoena on a nonparty requires personal service"); Charles A. Wright & Arthur R. Miller, 9A *Fed. Prac. & Proc. Civ.* § 2454 (3d ed.) ("The longstanding interpretation of Rule 45 has been that personal service of subpoenas is required."); *accord*, *e.g.*, *BBK Tobacco & Foods, LLP v. Central Coast Agriculture, Inc.*, 2021 WL 5507167 at *3 (N.D. Cal. Nov. 21, 2021) (Ryu, J.). Given this authority, it was reckless for Defendant to attempt to force Mr. Krivoshey to appear on the February 18, 2026 compliance date without personally serving him, and to refuse to extend the date until the motion to quash could be resolved.

Second, Defendant admits it never gave notice to the *Patel* plaintiffs about the second subpoena it purported to serve on the Non-Parties. As an excuse, Defendant states that this second subpoena was "materially identical" to the first subpoena, except that the definition of "You" in the document requests was changed from Mr. Krivoshey to the law firm Smith Krivoshey P.C. Opp'n Brf., 7:4-10; 19:7-8; 20-9-10. That statement ignores that the two subpoenas also had different compliance dates. Defendant also claims that "[b]oth subpoenas … listed the same place of compliance (San Francisco and remote)." *Id*. at 22:23-24. That is yet another half-truth. The Notice of Subpoenas served on *Patel* counsel stated that "Mr. Krivoshey's deposition will be conducted at 10:00 a.m. on February 10, 2026, at the law offices of Davis Wright Tremaine LLP, 350 S. Grand Avenue, Floor 27, <u>Los Angeles</u>, CA 90081." Krivoshey Decl., Ex. A. So, while the subpoena itself

listed the place of compliance as San Francisco, the notice provided to *Patel* counsel listed Los Angeles. There is no "legal dispute" that the date and location of a subpoena are material.

### 5. Defendant's Excuse That Rule 45 Does Not Support Sanctions Lacks Merit

Citing just one decision, Defendant briefly argues that Rule 45(d)(1) sanctions apply "primarily" to the costs of complying with a subpoena, rather than litigating the motion to quash, motion to shorten time, and motion for sanctions. *See* Opp'n Brf., 25:2-4 (quoting *Scientific Applications & Research Assocs. (SARA), Inc. v. Zipline Int'l., Inc.*, 2024 WL 5011603 at *2 (N.D. Cal. Dec. 6, 2024)). The same decision that Defendant cites, however, described an exception to that rule when "a party issues a subpoena in bad faith, for an improper purpose, or in a manner inconsistent with existing law." *Id.* at *2. That is precisely the argument made in the Non-Parties' opening brief. *See* Opening Brief, 17:15-16. More importantly, however, Defendant does not respond to the Non-Parties' arguments that Rule 26(g)(1)(B), 28 U.S.C. § 1927, and the Court's inherent powers all furnish separate and independent authorities for sanctions. *See*, *e.g.*, *Doung*, 2020 WL 2041939 at *9 (citing Rule 26 when issuing sanctions for an improper subpoena). By failing to respond, Defendant concedes these authorities govern here too, independently of Rule 45(d)(1). *See*, *e.g.*, *Pete v. Facebook Data Breach*, 2026 WL 32635 at *2 (N.D. Cal. Jan. 6, 2026) (collecting authorities holding that failure to respond in an opposition brief constitutes waiver).

### 6. Defendant's Excuse That The Non-Parties Purportedly Failed To Negotiate In Good Faith Lacks Merit

Defendant argues that sanctions are not warranted "where a subpoenaing party attempts to confer with the subpoenaed party." Opp'n Brf., 15:1-2. It then adopts a blame-the-victim approach by accusing the Non-Parties (who requested the meet and confer in the first place) of failing to confer in good faith. *See e.g.*, *id.* at 7:21-24; 15:20. This position is rebutted by the record and admissions by Defendant in its brief and declaration.

To start, Defendant repeatedly accuses the Non-Parties of being unwilling to negotiate the "scope of the subpoena," and faults them for later submitting "a sworn declaration … that supplied the precise information that GT sought." Opp'n Brf., 7:21-24; 15:20. However, Defendant does

controvert Mr. Krivoshey's sworn, *specific* testimony that during the meet and confer call, Defendant's counsel refused to disclose (a) whether the purpose of the subpoena was to determine whether Mr. Krivoshey continued to work on the *Patel* matter; and (b) whether the *Patel* plaintiffs had already produced responsive agreements with Dovel. *Compare* Krivoshey Decl., ¶¶ 36-37 (describing counsel's refusal to answer those questions) *with* Elie-Meyers Decl. ¶¶ 11-14 (containing no denial) (Dkt. 10-2). As shown in Defendant's opposition brief, these turned out to be the core issues Defendant wanted to know about. This begs the obvious question: how exactly were the Non-Parties supposed to negotiate the "scope of the subpoena" when Defendant would not disclose what it wanted or what documents it already had?

In a similar vein, Defendant suggests that the Non-Parties could have avoided motion practice by agreeing to provide declarations, as Dovel and Bursor & Fisher ("Bursor") did. There is nothing in Mr. Elie-Meyer's declaration stating that he made such a proposal during the meet and confer with the Non-Parties, because it never happened. *See* Elie-Meyers Decl. ¶¶ 11-14. As noted above, Defendant admits elsewhere in its brief that the proposal for declarations was made only "*after* Mr. Krivoshey submitted his own declaration." Opp'n Brf., 14:13-15. By that time, Bursor was on the verge of filing its own motion to quash and Defendant was on notice that one or more motions for sanctions would likely follow.

**III.    Addendum Responding To Defendant's Misstatements Concerning Prior Litigation**

Though not relevant to Defendant's conduct here, Defendant assails Mr. Krivoshey's character for his purported conduct in *Patel* and other actions where Mr. Harper is counsel of record. *See gen*. Opp'n Brf., 1-4. According to Defendant, the subpoena was "necessitated by Mr. Krivoshey's own conduct … in *Patel*," without a single sentence explaining how Mr. Krivoshey's prior conduct has anything to do with the subpoena served years after his withdrawal. *Id*. at 1:7. Non-Parties offer a short summary of *Patel* and *Retta*.[5]

---

[5] Defendant also asserts that this sanctions motion serves "as a vehicle to air preexisting grievances with counsel," citing Mr. Krivoshey's purported "forced withdrawal from [the *Patel* case], his abandonment of a nearly identical copycat case, and yet another forced withdrawal from [*Langford et al. v. Walmart Inc*., W.D. Ark. No. 5:25-cv-05228-TLB] after he was served with a Rule 11 motion-*all of which was led by undersigned counsel-Yeremey O. Krivoshey*." Opp'n Brf. at 1 and 1 n. 3 (emphasis added). Apart from the fact that Mr. Krivoshey has no

While an associate at Bursor, Mr. Krivoshey was one of the counsel for plaintiffs in *Retta v. Millennium Prods., Inc.*, C.D. Cal. No. 2:15-cv-01801-PSG-AJW. In that case, the plaintiffs alleged that kombucha beverages manufactured by Millennium Products. Inc. contained undisclosed levels of alcohol above the legal limit – *i.e.*, above 0.5% alcohol by volume ("abv"). The case settled for $8.25 million in 2017, in addition to a requirement that Millennium add a statement to the label about putative alcohol content. The claims of class members were released through February 26, 2017. *See generally Retta v. Millennium Prods., Inc.*, 2017 WL 5479637, at *2 (C.D. Cal. Aug. 22, 2017) (class period ends with date of notice, which occurred on February 26, 2017). Notably, the settlement did not require Millennium to add the "GOVERNMENT WARNING" required for beverages that contain more than 0.5% abv, or require Millennium's products to in fact remain below 0.5% abv. *See* 27 C.F.R. § 16.21. Thus, it was up to Millennium whether to manufacture beverages above 0.5% abv and label them as alcoholic beverages with the GOVERNMENT WARNING required by 27 C.F.R. § 16.21, or continue to market the beverages as *non-alcoholic* (*i.e.*, beverages containing less than 0.5% abv) and include only the watered-down "warning" required by the settlement. *See generally Retta*, 2017 WL 5479637, at *2 (discussing injunctive relief of settlement). Davis Wright, Tremaine and its attorneys Jacob Harper and Joseph Elie-Meyers were not involved in *Retta*.

In early 2017, Millennium reformulated the kombucha beverages that were at issue in *Retta*. *See Patel*, Dkt. 103, at 9. Kombucha products manufactured *after* the *Retta* settlement were not the same products at issue in *Retta*, at least formulaically. Defendant also changed its name, from Millennium Prods., Inc. to GT's Living Foods, LLC around that time.

In October 14, 2017, one of Defendant's competitors, Tortilla Factory, LLC, filed a Lanham Act case against GT's Living Foods, LLC on the basis that GT's Living Foods kombucha beverages were unlawful alcohol beverages exceeding the 0.5% abv threshold without the

"preexisting grievances," this statement is false and has no support in the record. Mr. Krivoshey is not on any pleadings in *Langford et al. v. Walmart Inc.*, W.D. Ark. No. 5:25-cv-05228-TLB, never made an appearance, and had no involvement. No Rule 11 letter in that case has ever been addressed to Mr. Krivoshey. And, as discussed below, Davis Wright Tremaine was not involved in *Retta* and did not appear in *Patel* until after Mr. Krivoshey's withdrawal.

required federal government warning. *Tortilla Factory, LLC v. GT's Living Foods, LLC*, Case No. 2:17-cv-07539-FMO-GJS (C.D. Cal.). The case proceeded to a bench trial before Judge Fernando M. Olguin. *See id.*, Dkt. 379 (Judge Olguin's Findings of Fact and Conclusions of Law). After the bench trial in June 2022, Judge Olguin found that Tortilla Factory's "evidence, including the testimony of its testing expert, Blake Ebersole, regarding the alcohol and sugar levels in GT's Enlightened products is credible and compelling. The lack of harm is what dooms plaintiff's case." *Id.*, Dkt. 379, at 8 n. 5. In other words, Judge Olguin was persuaded that GT's Living Foods' kombucha beverages exceeded the federal alcohol limits.

In 2019, two lawsuits over the alcohol levels in Defendant's products were filed, including a consumer class action filed on behalf of consumers by another, unrelated law firm, and by the Center for Environmental Health. *Zamora v. GT's Living Foods, LLC*, Case No. 19-05710 (Cal. Sup. Ct. Los Angeles); *Center for Environmental Health v. GT's Living Foods, LLC, et al.*, Case No. RG19047748 (Cal. Sup. Ct. Alameda Cty.). Neither Mr. Krivoshey nor his former law firm Bursor had any involvement with those cases. However, given the swell of litigation and renewed consumer interest in the issue, Bursor was later retained by new class members seeking to file a case. The pre-suit investigative testing showed that the newly formulated kombucha beverages were over the federal limit. Mr. Krivoshey's new clients filed the *Patel* case (then the *Sharpe* case) on December 27, 2019, while Mr. Krivoshey was still with Bursor. The putative classes in *Sharpe* were defined to begin with purchases made on February 28, 2017 and thereafter, after the close of the class period in *Retta* (where the class period ran through February 26, 2017).

Three days after filing *Sharpe*, Mr. Krivoshey filed a Notice of Related case, seeking for the matter to be related to *Tortilla Factory, LLC v. GT's Living Foods, LLC*, which, as discussed above, was then pending in the same district and concerned the same allegations of elevated alcohol levels in defendant's products. *Patel*, Dkt. 8. Judge Olguin, the judge overseeing *Tortilla Factory*, agreed that the cases were related, and the case was accordingly reassigned to Judge Olguin. *Id.*, Dkt. 10. Defendant did not object to the notice of related case, and never filed a notice of related case of its own. It seemed that relation to *Tortilla Factory* was more appropriate than to *Retta*, given that *Retta* was closed for two and half years by then, while *Tortilla Factory* was in

active litigation since October 2017. For *years* while *Sharpe* was pending, Defendant did not believe that the *Retta* case was relevant either, as it was not mentioned in the parties' Joint Rule 26(f) report, Defendant's motion to strike, Defendant's motion to dismiss, or Defendant's answer. *See Patel*, Dkts. 14, 23, 32, 54. The first time Defendant took the position that *Retta* had any impact on the *Sharpe* matter was in opposition to class certification, filed in August 2021. *See id.*, Dkt. 97-2.

The plaintiffs in *Sharpe* moved for certification of California and New York classes only. Mr. Krivoshey was concerned that the claims of class members from states outside California and New York may not be tolled while counsel waited for a ruling from Judge Olguin on class certification. Accordingly, plaintiffs who purchased the products in different states retained Bursor to file *Mukadam et al v. George Thomas Dave et al.*, Case No. 2:23-cv-10514 (C.D. Cal.), concerning largely the same allegations. The parties in *Mukadam* discussed potentially entering into a tolling agreement and staying the case while they waited for an order in *Sharpe*, but the case was ultimately dismissed without prejudice when no agreement was reached. Given the unfavorable class ruling in *Sharpe/Patel*, the case was not later refiled.

Judge Olguin denied class certification without prejudice on June 21, 2024. Mr. Krivoshey filed a request to withdraw on August 6, 2024, which was granted on August 7, 2024. *Id.*, Dkts. 137, 142. The first time Mr. Harper, or anyone from Davis Wright Tremaine LLP, appeared on the docket in *Patel* was August 7, 2024, effectively *after* Mr. Krivoshey had already withdrawn. *Id.*, Dkt. 145. Up to that point, Defendant was represented by O'Melveny and Meyers LLP, both in *Retta* and in *Sharpe/Patel*, though Mr. Krivoshey did discuss his withdrawal with Mr. Harper in July 2024 prior to Mr. Harper's formal appearance and assured him that he really would withdraw and have no role going forward.

## IV.   Conclusion

The Court should grant the Non-Parties' motion for sanctions in full. If the Court decides to issue monetary sanctions either in addition to or in lieu of ordering CLE, the Non-Parties ask the Court to order supplemental briefing after the hearing. Time records reflecting work done after the opening brief are submitted with this reply brief.

Dated:  March 13, 2026

Respectfully submitted,

 /s/    Joel D. Smith

**SMITH KRIVOSHEY, PC**
Joel D. Smith (State Bar No. 244902)
867 Boylston Street,
5th Floor, Ste. 1520
Boston, MA 02116
Phone: 617-377-7404
E-Mail:  joel@skclassactions.com

**SMITH KRIVOSHEY, PC**
Yeremey O. Krivoshey
(State Bar No. 295032)
28 Geary Street, Ste. 650 # 1507
San Francisco, CA 94108
Phone: 415-839-7000
E-Mail:  yeremey@skclassactions.com