DAVIS WRIGHT TREMAINE LLP
Jacob M. Harper (SBN 259463)
  *jharper@dwt.com*
Heather F. Canner (SBN 292837)
  *heathercanner@dwt.com*
Joseph Elie-Meyers (SBN 325183)
  *josepheliemeyers@dwt.com*
Peter K. Bae (SBN 329158)
  *peterbae@dwt.com*
350 South Grand Avenue, 27th Floor
Los Angeles, California 90071
Telephone:  (213) 633-6800
Fax:  (213) 633-6899

*Attorneys for Defendant*
*GT's Living Foods, LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMIT PATEL, LAUREN SCHMIDT, and CHRISTOPHER NUNEZ, on Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>GT'S LIVING FOODS, LLC,<br><br>Defendant. | ) Case. No. 3:26-mc-80036-TSH<br>)<br>) (Case No. 2:19-cv-10920-FMO-DSR Pending in the Central District of California)<br>)<br>) **DECLARATION OF JOSEPH ELIE-MEYERS IN SUPPORT OF OPPOSITION TO MOTION FOR SANCTIONS**<br>)<br>) *[Opposition; Motion to Consider Whether Another Party's Material Should Be Sealed; Declarations of Jacob Harper and Joseph Elie-Meyers; and [Proposed] Order Filed Concurrently]* |

ELIE-MEYERS DECLARATION IN SUPPORT OF
OPPOSTION TO MOTION FOR SANCTIONS

## DECLARATION OF JOSEPH ELIE-MEYERS

I, Joseph Elie-Meyers, declare as follows:

1.      I am an associate with the law firm of Davis Wright Tremaine LLP, counsel for GT's Living Foods, LLC (GT's) in the matter of *Patel et al. v. GT's Living Foods, LLC,* Case No. 2:19-cv-10920-FMO-DSR (C.D. Cal.) (*Patel*). I make this declaration in support of Non-Parties Davis Wright Tremaine LLP, Jacob M. Harper, and Joseph Elie-Meyers' Opposition to Motion for Sanctions. I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would competently testify to them.

2.      In December 2025, newly added plaintiffs Amit Patel, Lauren Schmidt, and Christopher Nunez (the new plaintiffs) in *Patel* produced in discovery copies of joint prosecution agreements between these plaintiffs' current and former counsel, including Yeremey Krivoshey. Those documents, which included a fee-sharing agreement between current and former counsel, gave rise to the concern that Mr. Krivoshey and other withdrawn counsel were playing an ongoing role, and had an ongoing financial interest, in the *Patel* litigation. True and correct copies of those joint prosecution agreements are attached hereto as **Exhibit 1**.

3.      In subsequent depositions of the new plaintiffs, GT's was unable to elicit information from these plaintiffs sufficient to address its concerns regarding the ongoing involvement and financial interest of former counsel in the *Patel* litigation. A true and correct copy of relevant portions of the new plaintiff Amit Patel's deposition transcript is attached hereto as **Exhibit 2**. A true and correct copy of relevant portions of the new plaintiff Christopher Nunez's deposition transcript is attached hereto as **Exhibit 3**. A true and correct copy of relevant portions of the new plaintiff Lauren Schmidt's deposition transcript is attached hereto as **Exhibit 4**.

4.      On January 29, 2026, GT's served the new plaintiffs with notices of subpoenas for deposition and documents to be served on Dovel & Luner (Dovel), Mr. Krivoshey, Bursor & Fisher PA (Bursor), and Adhoot & Wolfson, PC. A true and correct copy of the notice of subpoena is available on the docket at ECF No. 9-2, and a true and correct copy of the subpoena addressed to Mr. Krivoshey attached to the notice of subpoena is available at ECF No. 9-2 at Exhibit 2.

1

DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

5. After serving the new plaintiffs with notice, GT's made numerous attempts to serve Mr. Krivoshey with a deposition and document subpoena.

6. I am informed that on January 29, 2026, GT's attempted service on Mr. Krivoshey at 28 Geary Street, Ste. 650 No. 1507, San Francisco, CA 94108. This address was a mailing center, not a law office, and would not accept service on behalf of Mr. Krivoshey.

7. GT's Notice of Withdrawal, ECF No. 6, contained a typographical error regarding GT's first attempted service on Mr. Krivoshey, which incorrectly stated that the first attempt to serve Mr. Krivoshey at the Geary Street address was made on January 19. In fact, it was made on the afternoon of January 29, after service of notice on *Patel* plaintiffs. Attached as **Exhibit 5** is a true and correct copy of correspondence with GT's process server confirming service was attempted at 28 Geary Street, Ste. 650 No. 1507, San Francisco, CA 94108 on January 29, 2026.

8. After service at the Geary Street address failed, GT's subsequently prepared a materially identical subpoena for service on Mr. Krivoshey at his home address. I am informed that three service attempts were made between February 2 and February 4, 2026, though none was successful.

9. GT's then prepared another subpoena for service on Mr. Krivoshey through the registered agent of Mr. Krivoshey's law firm, Smith Krivoshey, PC. This subpoena was materially identical to the prior subpoena, except it provided for a unilaterally extended deposition date to provide reasonable time for compliance to February 18, 2026. I later learned that, due to a miscommunication with my colleague in the course of preparing the new subpoena, "You" in Attachment A to the subpoena was defined in error as "Smith Krivoshey PC, and where appropriate in the context, all representatives, managers, attorneys, employees, and agents acting on its behalf."  A true and correct copy of the subpoena (the Subpoena) served on Mr. Krivoshey's through his law firm's registered agent is available on the docket at ECF No. 9-3.

10. As I stated to Mr. Krivoshey on February 9, 2026 meet and confer call, GT's considered the later-served Subpoena with the February 18 date as the operative subpoena. Service

2

ELIE-MEYERS DECLARATION IN SUPPORT OF
OPPOSTION TO MOTION FOR SANCTIONS

of the Subpoena on the registered agent was accomplished on February 4, 2026. A true and correct copy of the proof of service of the Subpoena is attached hereto as **Exhibit 6**.

11. On February 9, 2026, I met and conferred with Mr. Krivoshey and Joel Smith regarding the subject Subpoena. From the outset of the call I was taken aback by Mr. Krivoshey and Mr. Smith's aggressive tone, unprofessional demeanor, and unwillingness to negotiate the scope or timing of subpoena compliance. Early in the call, Mr. Krivoshey and Mr. Smith informed me that if the subpoena was not withdrawn, they intended to move to quash and for sanctions. During the call I repeatedly informed Mr. Smith and Mr. Krivoshey that I believed their approach to the conferral was unprofessional and did not appear to be aimed at reaching a reasonable compromise.

12. During the conferral, I repeatedly offered to discuss limiting the scope of the Subpoena, or to extend the time for compliance to allow additional time to negotiate the scope of the Subpoena. Mr. Krivoshey and Mr. Smith declined to discuss limiting the scope of the Subpoena or modifying the date for compliance in furtherance of such negotiations. Instead, they stated that they intended to move to quash and for sanctions if the Subpoena was not withdrawn. Their all-or-nothing approach to the negotiation set the stage for an unproductive call and, in my view at the time and now, made open-handed and candid negotiation all but futile. Nevertheless, throughout the call I repeatedly informed them that I remained willing to negotiate the scope and timing of the Subpoena to alleviate any undue burden.

13. When Mr. Smith and Mr. Krivoshey inquired about the close of discovery, I accurately stated that discovery closed on March 5, 2026. When they asked me, in substance, if there was anything I would like to add regarding the close of discovery date, I replied that there was not. It was apparent from the tone and content of their questioning that Mr. Krivoshey and Mr. Smith were attempting to manufacture a situation from which they could impute to me a lack of candor. This was, in my view, confirmed when, immediately after asking me if I had anything to add, they asked me if I had intended to inform them of what they characterized as the limited

3

ELIE-MEYERS DECLARATION IN SUPPORT OF
OPPOSTION TO MOTION FOR SANCTIONS

scope of reopened discovery. At the time, as now, I believed that the subpoena sought information within the boundaries of the reopened discovery period.

14.    During the conferral, Mr. Smith and Mr. Krivoshey inquired as to the order of depositions, specifically the date for which Dovel's deposition had been noticed. I was not sure of the date offhand, and to confirm, referred to the notice of subpoenas issued to Dovel. Based on the notice of subpoena, I accurately told Mr. Smith and Mr. Krivoshey that Dovel's deposition had been noticed before the February 18 compliance date on Mr. Krivoshey's Subpoena. I neglected to mention that Dovel's noticed deposition date had subsequently been rescheduled as a result of meet-and-confer efforts, though I did not think this was relevant to the propriety of the subpoena at issue. I informed counsel that, in our view, the order of depositions was irrelevant to the propriety of Mr. Krivoshey's subpoena. Later, after Mr. Krivoshey and Mr. Smith had repeatedly and aggressively asked me which documents might be in their possession that were not in the possession of Dovel, I responded that we could not definitively know the answer to that question until after Dovel's deposition. I do not recall affirmatively representing that Mr. Krivoshey would actually be deposed before the Dovel was deposed, and do not believe I would have made that representation given that at the time the compliance date for all subpoenaed parties were in flux due to ongoing compliance negotiations.

15.    On February 10, 2026, Mr. Smith emailed to ask whether GT's would agree to vacate the compliance date pending a ruling on the motion to quash. In response, I offered to extend the Subpoena's compliance deadline to allow Mr. Krivoshey to move to quash, subject to the *Patel* plaintiffs' current counsel's agreement to extend the approaching March 5 discovery deadline. The intent of this offer was to accommodate Mr. Smith's request while also preserving GT's ability to seek third-party discovery from Mr. Krivoshey by extending the discovery deadline. A true and correct copy of the February 10 correspondence is available on the docket at ECF No. 9-5.

16.    On February 17, 2026, I emailed Mr. Krivoshey and Mr. Smith, informing them that the Subpoena was withdrawn in light of Mr. Krivoshey's sworn declaration submitted in

4

DAVIS WRIGHT TREMAINE LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

ELIE-MEYERS DECLARATION IN SUPPORT OF
OPPOSTION TO MOTION FOR SANCTIONS

support of the pending Motion to Quash, which set out largely the same information that GT's sought to obtain by way of subpoena. The email also advised Mr. Krivoshey and Mr. Smith of GT's intent to file with the Court its notice of withdrawal of the Subpoena. I also advised Mr. Krivoshey and Mr. Smith that other non-parties agreed in pre-motion conferrals to provide substantially similar declarations in lieu of depositions or documents. GT's withdrew its subpoenas to these other non-parties. A true and correct copy of the February 17, 2026 email is attached hereto as **Exhibit 7**.

17.     As explained above, Mr. Krivoshey rebuffed GT's conferral efforts, insisting from the outset that he would not negotiate compliance and intended to move to quash and for sanctions. In the meantime, I met and conferred with Bursor on February 9 and 17, 2026, and Dovel on February 4 and 13. During these conferrals, I agreed to reschedule deposition dates to continue negotiations.

18.     As result of continued discussions with the other subpoenaed counsel, Dovel and Bursor agreed, after extensive conferral regarding compliance with similar subpoenas, to provide sworn declarations describing the nature of their relationship with former counsel in the *Patel* litigation in lieu of deposition testimony or document production. GT's withdrew its subpoenas to Dovel and Bursor after they agreed to provide sworn declarations.

19.     A true and correct copy of the district court order denying class certification in *Patel*, ECF No. 129, is attached hereto as **Exhibit 8**.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 6th day of March 2026, at Los Angeles, California.

                                     _/s/ Joseph Elie-Meyers_
                                      Joseph Elie-Meyers

5

**DAVIS WRIGHT TREMAINE** LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

ELIE-MEYERS DECLARATION IN SUPPORT OF
OPPOSTION TO MOTION FOR SANCTIONS

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Davis Wright Tremaine LLP, Suite 2700, 350 South Grand Avenue, Los Angeles, California 90071.

On March 23, 2026, I served the foregoing document(s) described as: **DECLARATION OF JOSEPH ELIE-MEYERS IN SUPPORT OF OPPOSITION TO MOTION FOR SANCTIONS** by placing a true copy of said document(s) enclosed in a sealed envelope(s) for each addressee named below, with the name and address of the person served shown on the envelope as follows:

Simon Carlo Franzini
Gabriel Zachiah Doble
Richard E Lyon, III
Dovel and Luner LLP
201 Santa Monica Boulevard Suite 600
Santa Monica, CA 90401
Email: simon@dovel.com
Email: gabe@dovel.com
Email: rick@dovel.com

__X__   (VIA MAIL) I placed such envelope(s) with postage thereon fully prepaid for deposit in the United States Mail in accordance with the office practice of Davis Wright Tremaine LLP, for collecting and processing correspondence for mailing with the United States Postal Service. I am familiar with the office practice of Davis Wright Tremaine LLP, for collecting and processing correspondence for mailing with the United States Postal Service, which practice is that when correspondence is deposited with the Davis Wright Tremaine LLP, personnel responsible for delivering correspondence to the United States Postal Service, such correspondence is delivered to the United States Postal Service that same day in the ordinary course of business.

__X__   (VIA EMAIL) By forwarding a portable document file to the electronic mail address(es) below from electronic mail address **annajimenez@dwt.com**, at Floor 27, 350 South Grand Avenue, Los Angeles, California.

Executed on March 23, 2026, at Los Angeles, California.

☐   State   I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct.

X   Federal   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

_____
Anna Jimenez

1

ELIE-MEYERS DECLARATION IN SUPPORT OF
OPPOSTION TO MOTION FOR SANCTIONS

**DAVIS WRIGHT TREMAINE** LLP
350 SOUTH GRAND AVENUE, 27TH FLOOR
LOS ANGELES, CALIFORNIA 90071
(213) 633-6800
Fax: (213) 633-6899

# EXHIBIT 1

## FILED UNDER SEAL PURSUANT TO COURT ORDER

# EXHIBIT 2

January 16, 2026

HIGHLY CONFIDENTIAL

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

AMIT PATEL, LAUREN SCHMIDT, )
and CHRISTOPHER NUNEZ, on )
Behalf of Themselves and All )
Others Similarly Situated, )
                           )
            Plaintiffs, )
                           )
      vs.                  )      Case No.:
                           )      2:19-cv-10920-FMO-GJS
GT's LIVING FOODS, LLC, )
                           )
            Defendant. )
                           )
_____)

DEPOSITION OF

AMIT JYOTINDRA PATEL

LOS ANGELES, CALIFORNIA

JANUARY 16, 2026

HIGHLY CONFIDENTIAL

REPORTED BY:    ELIZABETH TORSTENBO, CSR NO. 9048, RPR

FILE NO.:       7727662

Page 1

January 16, 2026

HIGHLY CONFIDENTIAL

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

AMIT PATEL, LAUREN SCHMIDT, )
and CHRISTOPHER NUNEZ, on )
Behalf of Themselves and All )
Others Similarly Situated, )
 )
        Plaintiffs, )
 )
   vs.        )   Case No.:
 )   2:19-cv-10920-FMO-GJS
GT's LIVING FOODS, LLC, )
 )
        Defendant. )
 )
_____)

Videotaped Deposition of AMIT JYOTINDRA PATEL, taken on behalf of Defendants, at 350 South Grand Avenue, Suite 2700, Los Angeles, California, commencing at 9:58 a.m., Friday, January 16, 2026, before Elizabeth Torstenbo, CSR No. 9048, RPR.

Page 2

HIGHLY CONFIDENTIAL

A P P E A R A N C E S:

FOR PLAINTIFFS:

DOVEL & LUNER, LLP
BY:  MARTIN BRENNER, Esq.
201 Santa Monica Boulevard
Suite 600
Santa Monica, California 90401
(310) 656-7066
martin@dovel.com

FOR DEFENDANT:

DAVIS WRIGHT TREMAINE, LLP
BY: JACOB M. HARPER, Esq.
BY:  FELIX MURPHET, Esq.
350 South Grand Avenue
27th Floor
Los Angeles, California 90071
(213) 633-6800
jharper@dwt.com
fmurphet@dwt.com

VIDEOGRAPHER:

JONATHAN HERNANDEZ

Page 3

HIGHLY CONFIDENTIAL

I N D E X

WITNESS:  AMIT JYOTINDRA PATEL

EXAMINATION                      PAGE

    By Mr. Harper               7

    E X H I B I T S

NUMBER          DESCRIPTION          PAGE

Exhibit 1    Defendant GT's Living Foods, LLC's    49
   Amended Notice of Deposition to
   Plaintiff Amit Patel

Exhibit 2    Plaintiff Amit Patel's Responses    77
   and Objections to Defendant GT's
   Living Foods, LLC's Interrogatories
   to Plaintiff Amit Patel, Set One

Exhibit 3    Plaintiff Amit Patel's Responses    83
   and Objections to Defendant GT's
   Living Foods, LLC's Requests for
   Production to Plaintiff Amit Patel,
   Set One

Exhibit 4    Joint Prosecution Agreement    97

Exhibit 5    Agreement Concerning Sharpe Litigation   106

Exhibit 6    Instagram Advertisement    109

Page 4

HIGHLY CONFIDENTIAL

I N D E X (Cont.)

E X H I B I T S

NUMBER           DESCRIPTION           PAGE

Exhibit 7    Purchased at Whole Foods Market -    112
   Brentwood on December 14, 2023

Exhibit 8    Purchased at Whole Foods Market -    116
   3rd & Fairfax on December 20, 2023

Exhibit 9    Purchased at Whole Foods Market -    117
   Westwood on April 7, 2024

Exhibit 10   Purchased at Whole Foods Market -    118
   Brentwood on February 21, 2025

Exhibit 11   GT's Synergy organic kombucha label    121

Page 5

2 (Pages 2 - 5)

January 16, 2026

HIGHLY CONFIDENTIAL

your attorneys.

A.   I personally did not.

Q.   Did you give it -- without disclosing the contents of any communications with your --

MR. BRENNER:  I don't think this is going to work, Jacob.

MR. HARPER:  Yeah, I guess it's not.  Okay. That's fine.

Q.   Did you -- did you search anything else aside from your email and texts for documents in response to Request for Production No. 21?

A.   I thought you just asked about that. Anything -- oh, anything outside --

Q.   Outside, yes.

A.   I mean, I had communication with counsel.

Q.   Can you turn the page to page 22, where Request for Production No. 22 appears.

What did you do to search your -- I'm sorry.

What did you do to search for documents in response to Request for Production No. 22 in your text messages and emails?

A.   I believe there's an agreement I reviewed regarding this in my email.

Q.   Okay.  This is one of those times where I

Page 94

HIGHLY CONFIDENTIAL

think you answered a slightly different question from what I asked.  So I'm going to ask the reporter to ask it one more time.

(Record read.)

THE WITNESS:  So in my text messages, I didn't search.  In my emails, I reviewed a document related to those.

BY MR. HARPER:

Q.   Other than reviewing a document related to this, did you do anything else to search your emails for documents responsive to Request for Production No. 22?

A.   No.

Q.   And was it that retention agreement that you've previously referenced?

A.   That's right.

Q.   Okay.

Do you see page -- I'm sorry.  On line 15 of page 22, do you recognize the word -- the term -- do you recognize the law firm Smith, Krivoshey?

A.   Not in specific.

Q.   Do you recognize it in general?

A.   I believe previously there were other law firms associated with this case, but now it's solely Dovel.

Page 95

HIGHLY CONFIDENTIAL

Q.   How about Bibiyan Law Group?  Does that ring a bell?

A.   I didn't pay particular attention to any of the other ones other than Dovel, as I was communicated with Dovel.

Q.   Have you heard of Bursor and Fisher?

A.   I have -- I'll say the same.  I have no specific knowledge of any of the law firms outside of Dovel.

Q.   Okay.

Can you please turn to page 23.  What -- what did you do to search for documents, whether in email, text, or otherwise, for -- in response to Request for Production No. 23?

A.   I searched for "kombucha" and "GT's."

Q.   Did you do anything else?

A.   No.

Q.   Do you have any other documents that respond to Request for Production No. 23?

A.   No.

Q.   Do you have any other documents at all responsive to any of the requests for production in this docu -- in this Exhibit 3?

A.   None other than those that have been already communicated to counsel.

Page 96

HIGHLY CONFIDENTIAL

Q.   Other than search for the term "kombucha," the term "GT's," search for receipts, and pull the retention agreement you previously discussed, did you do anything else to search for any of the documents in Requests for Production 1 through 47?

MR. BRENNER:  Asked and answered.  Misstates testimony.

Go ahead.

THE WITNESS:  I don't believe I did anything other than those items.

BY MR. HARPER:

Q.   Okay.  And did your -- did you have your counsel look through your emails?

A.   No.  I did it myself.

Q.   Okay.

We'll mark as Exhibit 4 the next document.

(Deposition Exhibit 4 was marked.)

BY MR. HARPER:

Q.   Let me know when you've had a chance to review this.

A.   Okay.

Q.   Do you recognize this document?

A.   I do.

Q.   When was the last time you saw this document?

Page 97

25 (Pages 94 - 97)

January 16, 2026

HIGHLY CONFIDENTIAL

A. Some time ago. I believe early in 13:32:30 engaging with the claims in the summer of 2024. 13:32:36

Q. You haven't seen it since then? 13:32:43

A. I don't recall, specifically. I know of 13:32:46 it. I haven't specifically reviewed it since then. 13:32:48

Q. Is this the retention agreement that you 13:32:54 referenced when we were talking about documents that 13:32:57 you've pulled specifically in reference to RFP 21? 13:32:59

A. I believe this would be part of it, but 13:33:06 I'm not totally confident. 13:33:08

Q. Okay. Can you turn to the last page, 13:33:12 where it says "Client Approval." Do you see it? 13:33:25

A. Yes. 13:33:36

Q. Did you sign a version of this that -- 13:33:37 under the "Client Approval" where it says "Client 13:33:42 Signature"? 13:33:44

A. I don't particularly recall. 13:33:53

Q. Is there any other document through which 13:34:02 you would have -- 13:34:04

A. So -- 13:34:11

MR. BRENNER: Wait. There is no question 13:34:12 pending. 13:34:14

BY MR. HARPER: 13:34:14

Q. Well, go ahead and say what you were going 13:34:14 to say. 13:34:16

Page 98

HIGHLY CONFIDENTIAL

A. I was formulating my thought. I didn't 13:34:18 have it. I was saying, "So." 13:34:20

Q. No, you can formulate -- what else were 13:34:23 you going to say? 13:34:25

MR. BRENNER: Are you asking him to just -- 13:34:28

MR. HARPER: I'm asking him -- I'm asking him to 13:34:30 complete his thought. 13:34:31

THE WITNESS: So I was just going to expound on 13:34:34 my previous comment. 13:34:36

BY MR. HARPER: 13:34:37

Q. Okay. 13:34:37

A. Meaning I don't recall because it's been 13:34:38 quite a bit of time since I had signed the document. 13:34:39

Q. Okay. Is there any reason to think that 13:34:42 you did not sign this document? 13:34:45

A. There's no reason for me to believe I 13:34:46 didn't sign this document. 13:34:49

Q. Okay. Well, if you did sign it, why 13:34:51 didn't you produce it? 13:34:55

MR. BRENNER: Calls for a legal conclusion. 13:35:08

THE WITNESS: I believe there was a change in 13:35:15 the counsel that's pursuing this case. 13:35:19

BY MR. HARPER: 13:35:23

Q. Okay. But that's not my question. 13:35:23 So can you please repeat my question. 13:35:26

Page 99

HIGHLY CONFIDENTIAL

(Record read.) 13:35:37

MR. BRENNER: Calls for a legal conclusion. 13:35:39

THE WITNESS: I didn't search for it. 13:35:57

BY MR. HARPER: 13:36:00

Q. Why not? 13:36:00

A. I don't have a logical reason. 13:36:21

Q. Do you see in the second line where it 13:36:24 says "GT's" -- 13:36:26

A. Yes. 13:36:29

Q. -- on the front first page? If you 13:36:29 searched for it and you used the term "GT's," why would 13:36:31 not -- why wouldn't it have appeared in your search? 13:36:34

MR. BRENNER: Assumes facts. 13:36:38

THE WITNESS: So if this was attached as a PDF, 13:36:42 the search wouldn't generally go into the PDF. 13:36:44

BY MR. HARPER: 13:36:50

Q. So -- so are you saying that the search 13:36:50 terms -- the two search terms that you used didn't 13:36:54 search for attachments in the form of PDFs in your 13:36:56 emails and text messages? 13:37:00

A. So it searches the titles of the PDFs -- 13:37:02

Q. Okay. 13:37:06

A. -- but not the content of the PDFs 13:37:06 themselves. 13:37:09

Q. Do your emails have attachments in the 13:37:11

Page 100

HIGHLY CONFIDENTIAL

form of PDFs at times? 13:37:14

A. Yes. 13:37:16

Q. Did you do anything to search for 13:37:17 attachments for this case at all? 13:37:19

A. To the extent that search for "kombucha" 13:37:25 and "GT's" would have attachments, then they would show 13:37:26 up. 13:37:29

Q. But would those searches -- but you said 13:37:30 that the searches for "GT's" or "kombucha" would not 13:37:32 have searched the content of the PDFs; they would have 13:37:36 searched the titles of the PDFs. 13:37:39

A. The title of the email and the title -- or 13:37:42 the content of the email and the title of the PDF. 13:37:45

Q. But not the content of the PDF? 13:37:48

A. That's right. That's how search works in 13:37:50 email. 13:37:52

Q. Okay. Can you look at -- on page 1 of 13:38:34 Exhibit 4 under "Cost Reimbursement and Attorneys 13:38:38 Fees." Please review that section in its entirety, 13:38:43 going over through page 2 and to the top of page 3. 13:38:48 Let me know when you've had a chance. 13:38:53

A. All right. So just through the top of 13:40:14 page 3; correct? 13:40:16

Q. Yeah. 13:40:17

A. Okay. I've reviewed. 13:40:20

Page 101

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL

Q. Okay. Do you understand who current 13:40:21 counsel is as it's stated in those bullet points on 13:40:37 page 2? 13:40:42

A. Yes. It's defined in the first paragraph 13:40:47 of the agreement. 13:40:49

Q. Okay. And does that include a firm called 13:40:51 Smith, Krivoshey? 13:40:55

A. Yes, according to the first paragraph. 13:40:57

Q. And does it also include a firm called 13:41:00 Bursor and Fisher? 13:41:02

A. Yes. 13:41:03

Q. Okay. So back on page 2, do you 13:41:04 understand this at least here to reflect that there's 13:41:10 a -- a scale of different allocations of fee awards as 13:41:12 between Dovel on the one hand and those other counsel, 13:41:20 including Smith, Krivoshey and Bursor and Fisher, on 13:41:25 the other hand throughout the course of litigation? 13:41:29

A. Yes, I do. 13:41:32

Q. Okay. Do you have any reason to believe 13:41:36 that those allocations have differed in any way up to 13:41:37 this point? 13:41:46

A. I have no reason to believe they have 13:41:48 differed. 13:41:50

Q. Okay. 13:41:50

A. Well -- so let me -- let me say this. I 13:41:53

Page 102

HIGHLY CONFIDENTIAL

don't -- as a plaintiff, I don't particularly have an 13:41:56 interest in how counsel conducts its business. So I 13:42:01 don't have particular attention here other than 13:42:06 counsel, between them, is negotiating an agreement. I 13:42:08 know they're acting in the plaintiffs' favor. So I'm 13:42:14 not particularly reviewing any of these documents in 13:42:18 detail. 13:42:21

Q. What are your obligations to supervise 13:42:25 counsel in your position as a putative class 13:42:27 representative? 13:42:32

A. Sorry. Repeat the question. 13:42:37

(record read.) 13:42:47

THE WITNESS: One, to pursue justice for the 13:42:49 claims -- the alcohol claim, the sugar claim. And two, 13:42:52 to seek damages. 13:42:56

BY MR. HARPER: 13:42:58

Q. Okay. I'm asking something slightly 13:42:58 different. I'm asking about your -- what are your 13:43:00 duties to supervise the class counsel, not just your 13:43:03 duties to sort of generally oversee the class, but what 13:43:08 are your duties to supervise class counsel in your 13:43:11 capacity as the class representative who's purporting 13:43:15 to represent however many class members are out there? 13:43:19

MR. BRENNER: Object to form. 13:43:22

Go ahead. 13:43:23

Page 103

HIGHLY CONFIDENTIAL

THE WITNESS: To ensure that counsel is pursuing 13:43:41 the claims of the class with full intent and force to 13:43:44 bring justice for the claims. That's my supervisory 13:43:53 function as I interact with them. 13:43:57

BY MR. HARPER: 13:44:03

Q. Any other duties you have to supervise 13:44:03 class counsel that you're aware of -- 13:44:10

A. Yes. 13:44:12

Q. -- in your capacity as a -- in your 13:44:12 capacity as a class representative? 13:44:14

A. I would monitor for any malfeasance, any 13:44:16 ill-dealings. Anything of that sort I would want to 13:44:20 prevent counsel from pursuing. 13:44:23

Q. What would be an example of malfeasance or 13:44:26 ill-doings? 13:44:30

MR. BRENNER: Calls for speculation and a legal 13:44:32 conclusion. 13:44:35

Go ahead. 13:44:35

MR. HARPER: Well, that's fair. 13:44:36

Q. But I'm asking you to elaborate on your 13:44:37 own words that you just told me. So what are you -- 13:44:40 what are some examples of -- 13:44:43

A. So I described in general. The specifics 13:44:46 can be varied. I see no reason for me to speculate as 13:44:47 to what counsel can do. If I observe something, then I 13:44:59

Page 104

HIGHLY CONFIDENTIAL

can identify it. 13:45:02

Q. Would that include potential conflicts of 13:45:10 interest? 13:45:13

A. Yes, that could be a concern. 13:45:15

Q. How would you define a "conflict of 13:45:18 interest"? 13:45:21

A. In general or in specific to this? 13:45:26

Q. Specific to this. 13:45:30

A. And when I say, "This," meaning the 13:45:34 joint -- this agreement? 13:45:37

Q. Sure. 13:45:40

A. No, that wasn't -- that wasn't meant to 13:45:42 make this an example. It was a question if the 13:45:47 question is specific to this. 13:45:50

Q. Okay. Can you give me an example, in 13:45:52 general, of a conflict of interest that you were 13:45:55 referring to? 13:45:59

A. No, not with any great confidence. 13:46:06 Because I'm not legal -- trained in a legal aspect. 13:46:08 But as a lay person, I can observe and -- what 13:46:12 constitutes a conflict of interest. I don't have a 13:46:19 specific knowledge of, in the legal realm, what a 13:46:21 specific conflict of interest would be. But if I did 13:46:25 observe one, I could potentially figure it out. 13:46:28

MR. HARPER: I'm going to mark as Exhibit 5 the 13:47:06

Page 105

27 (Pages 102 - 105)

January 16, 2026

HIGHLY CONFIDENTIAL

next document.

(Deposition Exhibit 5 was marked.)

BY MR. HARPER:

Q. Let me know when you've had a chance to review.

A. Okay.

Q. Can you turn to the last page, where it says "Client Approval" on page 4 of Exhibit 5.

A. Okay.

Q. Did you sign a copy of this Client Approval?

A. It's showing blank here.

Q. Right. But that wasn't my question. My question is did you sign a version of this?

A. I believe I did.

Q. Okay. And why didn't you produce it?

MR. BRENNER: Jacob, if the question is why didn't he produce a communication between him and counsel, that seems like something you and I should discuss and not appropriate for this deposition.

You can answer if you know.

THE WITNESS: Why didn't I produce it was the question?

I'm sorry. Repeat the question, please.

(Record read.)

Page 106

HIGHLY CONFIDENTIAL

THE WITNESS: It didn't show up in the searches that I mentioned previously.

BY MR. HARPER:

Q. Okay. Aside from the Joint Prosecution Agreement that's Exhibit 4 and the Agreement Concerning Sharpe Litigation that's Exhibit 5, did you sign any other documents in the form of a retention agreement between yourself and class counsel for this matter?

A. Yes, I believe so.

Q. Okay. Did that not appear in your searches?

A. That would be the only reason that it didn't show up in the searches, that I searched for "kombucha" and "GT's" and it wasn't there.

Q. Okay. How many documents -- how many other retention agreement documents did you sign pertaining to retention that were not produced?

A. How many?

Q. Yeah.

A. I would need to -- I don't have knowledge of that specific number.

Q. Is it more than one additional document?

A. Can you repeat the question, please? Not the previous one but the one before that.

(Record read.)

Page 107

HIGHLY CONFIDENTIAL

THE WITNESS: I don't know if it's not greater than one.

BY MR. HARPER:

Q. So it could be one --

A. Sorry. I used a double negative too. Sorry. I don't know the number, specifically.

Q. Okay. Let me try this one more time.

There's at least one more document concerning the retention between you and class counsel securing you as the class representative and securing class counsel as class counsel in this case against GT's Living Foods; correct?

MR. BRENNER: Object to form. Calls for a legal conclusion.

Go ahead.

THE WITNESS: Sorry. Repeat the question.

(Record read.)

THE WITNESS: At least one more than the five documents that you've provided me?

BY MR. HARPER:

Q. No. At least one more than -- well, sure, yeah. At least one more than the five documents that we provided you?

A. I believe that's true.

Q. Okay.

Page 108

HIGHLY CONFIDENTIAL

Are there any more contracts or agreements between you and class counsel pertaining to retention in this case?

MR. BRENNER: Asked and answered.

Go ahead.

THE WITNESS: I think the -- the keyword there is more than what? Are there any more than -- than what you've shown me here or more than something in the ether? It has to be more than something.

BY MR. HARPER:

Q. Do you have -- I think we have it.

I'm going to mark as Exhibit 6.

(Deposition Exhibit 6 was marked.)

BY MR. HARPER:

Q. Let me know when you've had a chance to review this document.

A. Okay.

Q. Do you recognize this document?

A. I do not.

Q. This was not an Instagram ad that you had clicked on or similar to an Instagram ad that you had clicked on in response to -- or related to this case?

A. I don't have -- sorry.

MR. BRENNER: Let me object. Compound. Object to form. Vague.

Page 109

28 (Pages 106 - 109)

# EXHIBIT 3

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

AMIT PATEL, LAUREN SCHMIDT,
and CHRISTOPHER NUNEZ, on
Behalf of Themselves and
All Others Similarly
Situated,

       Plaintiffs,

vs.                     CASE NO.
                         2:19-cv-10920-FMO-GJS

GTS LIVING FOODS, LLC,

       Defendant.

_____

HIGHLY CONFIDENTIAL

VIDEO DEPOSITION OF CHRISTOPHER NUNEZ

January 8, 2026

10:07 a.m.

Los Angeles, California

Reported By:

Brandi R. Celestino

CSR No. 13640

Page 1

APPEARANCES:

For Plaintiff:

DOVEL AND LUNER LLP
BY: RONDA DIXON
    Attorney at Law
201 Santa Monica Boulevard Suite 600
Santa Monica, California 90401
310-656-7066
martin@dovel.com

For Defendants:

DAVIS WRIGHT TREMAINE LLP
BY: JACOB HARPER
    Attorney at Law
BY: JOSEPH ELIE-MEYERS
    Attorney at Law
350 South Grand Avenue, 27th Floor
Los Angeles, California 90071
213-633-6800
jacobharper@dwt.com
josepheliemeyers@dwt.com

ALSO APPEARING:
JAMAL JUDKINS, VIDEOGRAPHER

Page 2

INDEX TO EXHIBITS
CHRISTOPHER NUNEZ
Amit Patel v. GT's Living Foods, LLC
Thursday, January 8, 2026
EXHIBITS                          MARKED
Exhibit 1     Notice of Deposition          27
Exhibit 2     Guava Goddess Synergy          41
Exhibit 3     Photograph          51
Exhibit 4     Photograph          53
Exhibit 5     Photograph          54
Exhibit 6     Instagram Photograph          56
Exhibit 7     Instagram Photograph          58
Exhibit 8     Instagram Photographs          62
Exhibit 9     Synergy Kombucha Photograph          79
Exhibit 10    Ad Information          83
Exhibit 11    Joint Prosecution Agreement          87
Exhibit 12    Agreement Concerning Sharpe          92
              Litigation

Exhibit 13    Photograph          101

Exhibit 14    Photograph          108

Exhibit 15    Photograph          112

Exhibit 16    Photograph          114

Exhibit 17    Photographs          116

Exhibit 18    Aug 13, 2022 Email Re          118
              Thank You For Your Recent Purchase
Exhibit 19    Responses to Objections          133

Page 4

INDEX TO EXAMINATION
WITNESS: CHRISTOPHER NUNEZ
EXAMINATION                          PAGE
By Mr. Harper                          6

Page 3

EXHIBITS CONTINUED:

Exhibit 20    Responses to Objections          143

Page 5

2 (Pages 2 - 5)

at the time, it would have been to them.   13:28:08

But, again, I don't remember the name of the   13:28:10 firm at the time that I clicked the ad, or the name of   13:28:12 the firm that I was communicating with after I clicked   13:28:15 the ad and they had followed up.   13:28:17

Q   When was the first time that you spoke to   13:29:30 Martin Brenner?   13:29:33

A   Let's see.  Again, I'm kind of estimating on   13:29:36 the exact date here, but I believe it would have been   13:29:40 perhaps mid 2025.   13:29:47

But, again, that's a pretty rough estimate.   13:29:50

Q   Why do you think it was mid-2025?   13:29:57

A   I know definitely it was a communication with   13:29:59 them late 2025, and that's when it was more extensive   13:30:01 back and forth.  More details about this was the   13:30:06 extent of the case and what it means to be a class   13:30:10 representative.  But when exactly those conversations   13:30:14 started with Martin, I don't quite remember, but I   13:30:16 know it must have been before that point.   13:30:19

Q   How about Simon Franzini?  Does that sound   13:30:25 familiar?   13:30:30

A   It does not sound familiar to me, no.   13:30:31

Q   How about Rick Lyon?  Does that name sound   13:30:36 familiar?   13:30:39

A   No.   13:30:39

Page 86

Q   Other than Martin Brenner, what are other   13:30:45 names of other attorneys that you've worked with at   13:30:52 Dovel Luner?   13:30:55

A   My main point person has been Martin Brenner.  13:30:57 There was someone else, but I do not remember their   13:31:01 name.  It was another man working at Dovel Luner.   13:31:05

Q   Was it Yeremey Krivoshey?   13:31:10

A   I don't believe so, no.   13:31:14

Q   Was it David Wasserman?   13:31:16

A   I don't think so.   13:31:20

Q   Were you promised anything when you decided   13:31:45 to join the class action against GT's Living Foods?   13:31:50

A   No.   13:31:58

MR. BRENNER:  Objection.  Vague.   13:31:59

THE WITNESS:  No.  No promises were made.   13:32:01

MR. HARPER:  I'm going to mark as Exhibit   13:32:27 11.   13:32:45

(Exhibit 11 marked.)   13:32:45

BY MR. HARPER:   13:32:46

Q   Do you recognize this document?   13:32:46

A   This does look familiar, yes.   13:33:05

Q   What is this document?   13:33:06

MR. BRENNER:  Objection.  California.   13:33:12

THE WITNESS:  To my understanding, it's an   13:33:16 agreement of law firms to work together in this case   13:33:19

Page 87

against GT's.   13:33:22

BY MR. HARPER:   13:33:23

Q   Have you seen this document before?   13:33:23

A   I believe so, yes.   13:33:25

Q   When did you see it?   13:33:26

A   If I had to estimate, perhaps like late 2024,   13:33:30 early 2025.  Again, I'm not certain of this date.   13:33:43

Q   Did you sign a copy of this?   13:33:46

A   I believe I did so, yes.   13:33:52

Q   Can you turn to page 2, please.   13:34:03

So the first paragraph starting with "if the   13:34:13 parties receive additional funds" down to -- well,   13:34:16 just review this page, and then I'll ask you some   13:34:25 questions about it.   13:34:29

Actually, what I'll have you do for   13:34:40 completion, read the entire document, but I want you   13:34:42 to pay particular attention to "cost reimbursement of   13:34:44 attorneys fees" on page 1 through the end of that   13:34:47 section at the top of page 3.   13:34:53

A   Okay.  Okay.  I reviewed it.   13:34:56

Q   What do you understand this section to   13:35:48 address?   13:35:52

A   To my understanding -- again, I'm not a   13:35:56 lawyer so I'm not -- probably not interpreting it   13:36:00 exactly correctly, but it has to do with how   13:36:04

Page 88

compensation will be divided up between the law firms   13:36:08 and the counsel.  And depending on certain situations,   13:36:10 how those percentages would differ.   13:36:15

Q   By counsel, you mean Dovel Luner and the   13:36:20 other law firms that are listed in this agreement;   13:36:24 correct?   13:36:27

A   Yes, I believe so.  I'm not entirely certain   13:36:27 how I fit into which category, but I -- I think my   13:36:33 understanding is I'm also a part of this as well.   13:36:37

Q   Well, at the end, on page 5, it has a client   13:36:40 approval.  It says "I have read and understood and   13:36:48 consent to the terms of this agreement," I assume   13:36:50 that's the section that you signed, correct, as the   13:36:53 client?   13:36:55

A   Correct.   13:36:56

Q   Now, the other counsel that refers -- I'm   13:36:58 looking now at page 1 of Exhibit 11.  That would   13:37:01 include Smith Krivoshey; correct?   13:37:05

A   Yes.   13:37:09

Q   And Bursor & Fisher; correct?   13:37:09

A   Yes.   13:37:11

Q   And Zimmerman Reed; correct?   13:37:11

A   Yes.   13:37:13

Q   And Wasserman Law Group; correct?   13:37:14

A   Yes.   13:37:17

Page 89

23 (Pages 86 - 89)

January 8, 2026

Q    So back to page 2.  Sorry for the back and forth.

So this section lists a series of allocations of funds between Dovel on the one hand, and those other law firms on the other, depending on the stage of the case; correct?

A    Correct.  To my understanding, yes.

Q    Do these allocations still exist to this day?

MR. BRENNER:  Calls for speculation.  Calls for a legal conclusion.

Go ahead.

THE WITNESS:  Yeah, I'm not entirely sure if there's been updates to the agreement or if these specific allocations still hold.  I'm not too familiar with the current state of those allocations, no.

BY MR. HARPER:

Q    Do you have any reason to think that they don't still hold?

A    I don't have any reason to believe that they differ from what's been presented here.

Q    Do you understand your duties as class representative to include supervising class counseling?

A    I'm not sure I understand what that means.

Q    Do you supervise class counsel in your

Page 90

capacity as a class representative?

MR. BRENNER:  Vague as to "supervise."

Go ahead.

THE WITNESS:  Could you explain what class counsel is?

BY MR. HARPER:

Q    Dovel and Luner, the lawyers listed on this page.

MR. BRENNER:  Objection to the extent it misstates what class counsel is.

Go ahead.

THE WITNESS:  So if I'm understanding the question correctly, you're asking me if I advise Dovel and Luner and the other law firms listed on this document.

BY MR. HARPER:

Q    No.  I'm asking if you supervise Dovel and Luner and any of the other law firms listed on this document?

A    No, I do not supervise Dovel and Luner or any of the other law firms.

Q    Do you supervise any of the lawyers in this lawsuit?

MR. BRENNER:  Objection.  Vague as to supervise.

Page 91

THE WITNESS:  No.  I do not supervise in that capacity either.

BY MR. HARPER:

Q    Do you have any oversight whatsoever over the lawyers in this lawsuit?

MR. BRENNER:  Objection.  Vague as to oversight.

THE WITNESS:  No, I do not have any oversight in regards to any of the lawyers or firms as mentioned in this document.

BY MR. HARPER:

Q    Do you know who the lawyers are in this lawsuit other than Martin Brenner?

A    Martin Brenner is who I associate with Dovel and acts on their behalf.  I'm not familiar on a name basis of the other lawyers who are involved.  No.

MR. HARPER:  I'm going to hand you what we'll mark as Exhibit 12.

(Exhibit 12 marked.)

BY MR. HARPER:

Q    Take a minute to review it.

A    I reviewed it.

Q    Okay.  Have you seen this document before?

A    It looks familiar, yes.

Q    Have you signed this document?

Page 92

A    I have reason to believe so, yes.

Q    Can you tell me generally what this document is?

A    I believe, to my understanding, this document is a notice stating that Dovel will be taking on -- will be taking over as lead counsel for this case.

Q    Do you see anything in this document that says that the other law firms, including Smith Krivoshey, will no longer have any share of any proceeds from any class settlement or award to the class in this case?

MR. BRENNER:  Object to form.  Calls for a legal conclusion.

Before you answer, review the document.

THE WITNESS:  I'm prefacing by saying I'm not a lawyer and I'm not sure if I'm interpreting this document correctly, but it looks like, to my understanding, that the material cost incurred by -- will be borne and paid by Dovel.

I do see that Zimmerman has been included as co-counsel, and stayed on the case for continued litigation.  I'm not sure if that means that they also are entitled to a part of the compensation after the fact.  Again, that might just be previous document that's went more into detail about what that

Page 93

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL

January 8, 2026

negotiation looks like.

But, again, I'm not super familiar with that nitty-gritty detail.

BY MR. HARPER:

Q   Let's go to the top where is says -- the very first paragraph where it starts with "First agreement."

Do you see that?

A   Yes.

Q   And then the second sentence, it says "it is between Dovel and Luner on the one hand, and Smith Krivoshey PC, Bursor & Fisher PA, Zimmerman Reed LLP, and Wasserman Law Group relating to its efforts before Zimmerman came into the case."

And then it says "the parties of this agreement will be collectively referred to as the parties."

Do you see that?

A   I do.

Q   Do you understand all of those firms, Dovel, Smith and Krivoshey, Bursor & Fisher, Zimmerman Reed, Wassermann Law Group to be the parties that's referred to in this agreement?

A   I do understand that, yes.

Q   Go down to -- under attorneys' fees and

Page 94

costs."

A   Okay.

Q   And just read that section through the rest of it at the top of page 2.

Read it to yourself.

A   Okay.

Q   In that section regarding attorneys' fees and costs, is there anything rescinding or otherwise altering the fee allocation as between Dovel and Luner on the one hand and the other law firms, from the prior exhibit?

MR. BRENNER: Jacob, to be clear, you're just talking about this section?

MR. HARPER: Yes.

MR. BRENNER: Okay. Calls for a legal conclusion.

Go ahead.

THE WITNESS: It is a little bit hard for me to interpret, but I believe that the -- what this is essentially getting at is each of these parties has the ability to seek an award of cost or fees that they incurred. So Dovel and all the other law firms listed. And that previous agreements among Bursor Fisher and Smith Krivoshey remain in effect.

BY MR. HARPER:

Page 95

Q   And is there anything else in this document that's Exhibit 12 that we're just looking at here that changes the fee allocation schedule as between Dovel and the other law firms?

MR. BRENNER: Calls for a legal conclusion.

Go ahead. After you review the document.

THE WITNESS: To my understanding, other than what was already previously discussed, no.

BY MR. HARPER:

Q   What evidence do you have that your first purchase of GT's Living Foods Kombucha first took place in 2020?

A   I remember drinking it consistently during the COVID-19 pandemic, during the lockdown, which I know started in March of 2020.

Again, I don't have the exact date of when I made my first purchase memorized, but I can reasonably assume that it was in early 2020, around the start of the COVID-19 pandemic lockdown that I made my first purchase.

Q   Other than your -- other than your reasonable assumption, as you just said, about taking -- your first purchase taking place in early 2020 of GT's Living Foods Kombucha, are you certain that it wasn't -- that your first purchase wasn't before

Page 96

2020?

A   I have no reason to believe so, no.

Q   But are you certain?

MR. BRENNER: Objection. Asked and answered.

THE WITNESS: Yeah, I don't have any reason to believe that I made a purchase before 2020. It is my best guess that the first purchase I made of GT's was, again, early 2020, around the start of the COVID-19 pandemic in March of 2020.

BY MR. HARPER:

Q   Do you have a receipt of your first purchase of GT's Kombucha?

A   I do not have a receipt of my first purchase.

Q   Do you have a receipt of any purchases from 2020 of GT's Living Foods Kombucha?

A   I don't believe I have a receipt from 2020, no.

Q   Do you have any evidence of any purchase of GT's Living Foods Kombucha from 2020?

MR. BRENNER: Asked and answered.

Go ahead.

THE WITNESS: I don't have any receipts from 2020, I don't believe. I know -- I think I have

Page 97

25 (Pages 94 - 97)

# EXHIBIT 4

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

--------------------------------x

AMIT PATEL, LAUREN SCHMIDT,

and CHRISTOPHER NUNEZ, on

Behalf of Themselves and All

Others Similarly Situated,

       Plaintiffs,

  Vs.  Case No. 2:19-cv-10920-FMO-GJS

GT'S LIVING FOODS, LLC,

       Defendant.

--------------------------------x

      HIGHLY CONFIDENTIAL

    Videotape Deposition of Lauren Schmidt taken by Defendants pursuant to Notice, taken on January 14, 2026 beginning at 10:13 a.m., held at the offices of Davis Wright Tremaine, LLP, 1251 Avenue of the Americas, New York, New York 10020, before Maureen Ratto, a Registered Professional Reporter, Certified Court Reporter and Notary Public.

Page 1

APPEARANCES:

On Behalf of Plaintiffs:
DOVEL & LUNER, LLP
201 Santa Monica Boulevard
Santa Monica, California 90401
BY: MARTIN BRENNER, ESQ.
martin@dovel.com

On Behalf of Defendant:
DAVIS WRIGHT TREMAINE, LLP
1251 Avenue of the Americas
New York, New York 10020
BY: JOSEPH CARL ELIE-MEYERS, ESQ.
josepheliemeyers@dwt.com

ALSO PRESENT:
DEVERELL WRITE, Legal Videographer

Page 2

VIDEOGRAPHER: We are going 10:13:41
on the record. The time on the 10:13:41
video monitor is 10:13 a.m. on 10:13:43
January 14, 2026. 10:13:47
This is Media Unit 1 of the 10:13:50
video-recorded deposition of Lauren 10:13:52
Schmidt taken by counsel for the 10:13:55
defendant in the matter of Amit 10:13:58
Patel, et al versus GT's Living 10:14:03
Food LLC. 10:14:08
This case is filed in the 10:14:09
United States District Court for 10:14:11
the Central District of California, 10:14:11
Western Division. 10:14:14
My name is Deverell Write 10:14:15
representing Veritext Legal 10:14:18
Solutions. The court reporter is 10:14:20
Maureen Ratto from Veritext Legal 10:14:21
Solutions. 10:14:23
At this time will counsel 10:14:24
state their appearances? 10:14:25
MR. ELIE-MEYERS: My name is 10:14:27
Joseph Elie-Meyers. I'm counsel 10:14:28
for GT's Living Food from Davis 10:14:30
Wright & Tremaine. 10:14:33

Page 3

MR. BRENNER: Martin Brenner 10:14:33
from Dovel & Luner, counsel for 10:14:34
plaintiffs. 10:14:36
VIDEOGRAPHER: Will the 10:14:38
reporter please swear in the 10:14:39
witness? 10:14:40
* * * 10:14:48
LAUREN SCHMIDT, having been 10:14:48
first duly sworn according to law by 10:14:48
the Officer, testifies as follows: 10:14:48
DIRECT EXAMINATION BY MR. ELIE-MEYERS: 10:14:49
Q. Good morning. 10:14:49
A. Good morning. 10:14:51
Q. Would you please state your 10:14:52
name and spell it? 10:14:54
A. Lauren Schmidt, L-a-u-r-e-n, 10:14:55
S-c-h-m-i-d as in David, t as in Tom. 10:15:01
Q. Have you ever used any other 10:15:08
last name besides Schmidt? 10:15:09
A. No. 10:15:11
Q. Have you ever used the name 10:15:11
last name Etta, E-t-t-a, on social media? 10:15:13
A. Yes. 10:15:17
Q. I'm going to hand you what the 10:15:17
court reporter is going to mark as 1. 10:15:41

Page 4

(Schmidt Exhibit 1, LinkedIn 10:15:41
page for Lauren Etta was received 10:15:41
and marked on this date for 10:15:41
identification.) 10:15:44
Q. Would you just review this 10:15:44
exhibit, please? 10:15:45
A. Yes. 10:15:46
Q. And do you recognize this? 10:15:46
A. Yes, I do. 10:15:47
Q. What is it? 10:15:48
A. It's my -- I think it's my 10:15:48
Facebook account. It is. 10:15:50
Q. And what is the name that 10:15:54
appears next to the profile picture? 10:15:55
A. Lauren Etta. 10:15:57
Q. And what does the last name 10:15:58
Etta -- 10:16:00
A. It's my middle name. 10:16:01
MR. BRENNER: Lauren, try to 10:16:04
pause to let him finish. 10:16:05
A. Sorry. 10:16:06
Q. And I'll get to that. You're 10:16:06
doing great, but I want to get to the 10:16:09
instructions in a second. 10:16:09
A. Okay. 10:16:09

Page 5

2 (Pages 2 - 5)

January 14, 2026

with any attorneys from any other law firm, other than myself and other than -- sorry, I got lost in my own question.

Other than me and your attorneys at Dovel & Luner, have you spoken with any other attorneys from any other law firms about this litigation?

A. I do not -- to my knowledge, no.

Q. When was the first time you were put in contact with Martin Brenner?

A. I believe it was December of 2024 but it may have been before. It may have been a month or two before that but it was the end of -- somewhere around the fall of 2024.

Q. When was the first time you were in contact with the attorney who you think might be named Simon?

A. End of summer, August-ish.

Q. Of what year?

A. 2024, I believe.

Q. Ever spoken with Rick Lyon about this case?

A. No.

Page 62

(Schmidt Exhibit 6, Joint Prosecution Agreement, Bates PLAINTIFFS0000042 was received and marked on this date for identification.)

Q. I'm handing you what the court reporter is marking Exhibit 6. Do you recognize this document?

A. Vaguely.

Q. Have you seen this document before?

A. I believe so.

Q. Do you have any understanding of what this document sets out?

A. It's regarding the attorneys' fees.

Q. I want to direct your attention to the first paragraph of the first page. Let me know once you've had a chance to review that paragraph.

(Deponent reviews the document.)

A. Yes. Okay.

Q. Do you recognize the name of the law firm Smith Krivoshey, PC?

Page 63

A. It's not familiar to me.

Q. Have you had any contact with an attorney from Smith Krivoshey, PC?

A. Not to my knowledge.

Q. Do you recognize the name of the law firm Bursor & Fisher, PA?

A. No.

Q. Have you ever had any contact with an attorney from that law firm?

A. Not to my knowledge.

Q. And do you recognize the law firm Zimmerman Reed, PC?

A. Other than you saying their name.

Q. So you've never had any contact with anyone from Zimmerman --

A. Correct.

Q. What about Westerman Law Corp., do you recognize that law firm name?

A. No.

Q. Have you had any contact, to your knowledge, with anyone attorney from Westerman Law Corp.?

A. No.

Page 64

Q. I'll direct your attention to page 2. Please review the first paragraph and the bullet points that follow. Let me know when you've reviewed that.

A. Okay.

Q. In your own words, what do you understand this portion of the agreement to set out?

A. It is a fee structure, and I'm not an attorney so I couldn't tell you -- I could tell you broadly, it's a fee structure.

Q. Do you understand this to describe the ways in which your counsel will split any proceeds of this lawsuit with other law firms?

A. Yes.

Q. And do you understand that your law firm Dovel & Luner will get a larger percentage of the proceeds of this lawsuit, if any, depending on when this case settles --

MR. BRENNER: Objection, misstates facts. Go ahead.

Q. -- if it settles or is

Page 65

17 (Pages 62 - 65)

resolved?

A. I'm sorry. Can you repeat the question?

Q. Do you understand that your law firm Dovel will get more money if this lawsuit is resolved in your favor later in the litigation?

MR. BRENNER: Objection, misstates facts, calls for a legal conclusion. Go ahead.

A. I am not an attorney. I'm not sure if I'm interpreting this correctly. I do not know.

Q. Have you reviewed this document before?

A. Yes, it is ringing a bell.

Q. I want to direct your attention to the last page of this document. Does that say "Client approval" at the top?

A. It does.

Q. And does it have a space for client name and client signature?

A. Yes.

Q. Do you recall if you signed

Page 66

this document at any point?

A. I do not recall but -- I do not recall. I defer to my attorney.

Q. You don't know if you signed this and sent it back to your attorney?

MR. BRENNER: Asked and answered. Go ahead.

A. I do not recall.

(Schmidt Exhibit 7, Agreement Concerning Sharpe Litigation, Bates PLAINTIFFS0000047 was received and marked on this date for identification.)

Q. I'm going to hand you what's been marked as Exhibit 7 by the court reporter.

Do you recognize this document?

A. Vaguely, but I think because it is very similar to the other document.

Q. On the first page it says it's an agreement regarding the Sharpe litigation?

A. Yes.

Q. Do you have any understanding

Page 67

of what this document sets out?

A. It looks, again, to be regarding attorneys' fees and costs.

Q. I just want to direct your attention to the last page of this document. Does that say "Client approval" at the top?

A. Yes.

Q. Is there space for your client name and a client signature?

A. Yes.

Q. Do you recall if you signed this document?

A. I do not recall. I defer to my attorney.

Q. Do you know if this document supercedes or cancels the prior Joint Prosecution Agreement that we discussed a few minutes ago?

MR. BRENNER: Calls for a legal conclusion. Go ahead.

A. I'm not an attorney. I do not know.

Q. I'm just asking for your understanding.

Page 68

Do you have any understanding if this cancels the prior Joint Prosecution Agreement or supercedes it?

A. I do not know.

Q. In preparing for this deposition today, did you review Exhibit 6, the Joint Prosecution Agreement?

A. I do not know if it's a specific document or not. They're blending together.

Q. In preparing for this deposition today, did you review Exhibit 7, which is the agreement concerning the Sharpe litigation?

A. I do not recall.

Q. Sitting here today, do you have any understanding of your law firm, Dovel & Luner's relationship with the law firms that are listed in these two agreements?

MR. BRENNER: Vague. Go ahead.

A. At a high level. But, again, I'm not an attorney. I believe some of these attorneys were involved well before I was involved in the case when Dovel &

Page 69

18 (Pages 66 - 69)

Luner took it over.

Q. I'm going to hand you what the court reporter is marking as Exhibit 8.

(Schmidt Exhibit 8, copy of legal advertisement re: GT Enlightened or Synergy Kombucha was received and marked on this date for identification.)

Q. Do you recognize this document?

A. Yes, I believe so. It looks -- yes.

Q. What is it?

A. I think there was something similar on Instagram that I clicked on the link for, this class action.

Q. What caused you to click on the link when you saw it on Instagram?

A. The dates, the fact that the Synergy Kombucha by GT's Living Foods or Synergy Kombucha that I had purchased between those dates may have had alcohol in them beyond the legal limit and I was avoiding alcohol at that time.

Q. And when you saw this

advertisement or a similar advertisement, you clicked on it; is that right?

A. Yes.

Q. Who did you speak to, if anyone, about this lawsuit after clicking this advertisement?

A. I believe it was a Steven at Dovel & Luner but I'm not 100% sure if that's the individual but someone reached out to me.

Q. I'm going to hand you what's been marked by the court reporter as Exhibit 9.

(Schmidt Exhibit 9, Ad Information, date captured July 4, 2024 was received and marked on this date for identification.)

Q. I'm just going to direct your attention to the right box that begins with Consumer Advocates. Do you see that?

A. Yes.

Q. Do you recognize the text that appears under Consumer Advocates?

A. Yes.

Q. Have you seen that text

before?

A. Yes, I believe so.

Q. In what context?

A. I believe it was probably under the picture of the Instagram post that I saw and clicked on.

Q. Do you understand this to be an advertisement seeking out plaintiffs for this class action?

A. Correct, yes.

Q. Do you believe that you may receive a fee as a class representative in this case?

A. I defer to my attorney.

Q. Sitting here today I'm just asking for your understanding.

A. Do I get a fee as a class representative?

Q. I'll start again.

A. Sorry.

Q. Sitting here today, and I'm asking for your understanding, do you believe that you may be entitled to a fee as a class representative in this case?

MR. BRENNER: Objection to the

term "fee" but go ahead.

A. I'm not an attorney. I hired an attorney to identify what I'm entitled to.

Q. Do you have any expectation about the amount of fees or I'll even say awards that you might be able to receive as a class representative in this case?

A. Other than a full refund for what I have purchased, I defer to my attorneys for any other damages that have been sought.

Q. Do you know if you are seeking any damages other than a full refund in this case?

A. I defer to my attorney.

Q. I'm just going to ask you to answer these questions based on your own understanding. If you don't know you can say that, but if you have any understanding I'd ask you to give me your best understanding, sitting here today.

Do you have any expectation about the amount of money you might recover through this lawsuit?

# EXHIBIT 5

## Goitia, Nichele

| | |
|---|---|
| **From:** | status@apex.legal |
| **Sent:** | Thursday, January 29, 2026 3:36 PM |
| **To:** | Goitia, Nichele |
| **Subject:** | Process diligence report for Apex Process control number is: 64093 |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

**[EXTERNAL]**

Apex control number: **64093**
Your file number is: 123411-2
Case Name: AMIT PATEL, LAUREN SCHMIDT vs GT'S LIVING FOODS, LLC

Re Servee:
**Yeremey O. Krivoshey Smith Krivoshey, PC,**

The diligence is as follows:

Date: 1/29/2026
Time: 2:50 PM
Address Attempted: 28 Geary Street, Ste. 650 No. 1507, , San Francisco, CA 94108
1/29 2:50 PM this address is a mailbox center, not a private office. Mailbox center worker said they are not authorized to accept service and refused to take the papers. PLEASE ADVICE


Thank you,

**Apex Legal Services - 213.488.1500. - Email: Service@apex.legal**

1

# EXHIBIT 6

| | |
|---|---|
| *Attorney or Party without Attorney:*<br>Jacob M. Harper<br>Davis Wright Tremaine LLP<br>350 S. Grand Ave – 27th Floor<br>Los Angeles, CA 90071<br>*TELEPHONE No.:* (213) 633-6800    *FAX No. (Optional):* (213) 633-6899 | *FOR COURT USE ONLY* |

*E-MAIL ADDRESS (Optional):*

*Attorney for:* Defendant

*Ref No. or File No.:*
123411-2

*Insert name of Court, and Judicial District and Branch Court:*
UNITED STATES DISTRICT COURT - CENTRAL DISTRICT OF CALIFORNIA

*Plaintiff:* AMIT PATEL, LAUREN SCHMIDT

*Defendant:* GT'S LIVING FOODS, LLC

| **PROOF OF SERVICE** | HEARING DATE: | TIME: | DEPT.: | CASE NUMBER:<br>2:19-cv-10920-FMO-DSR |
|---|---|---|---|---|

AT THE TIME OF SERVICE I WAS AT LEAST 18 YEARS OF AGE AND NOT A PARTY TO THIS ACTION
**I SERVED COPIES** OF THE FOLLOWING DOCUMENTS:

**SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION**

|  |  |
|---|---|
| PARTY SERVED: | **Smith Krivoshey, PC / Yeremey O. Krivoshey** |
| PERSON SERVED: | **Ahsley Dawn - Authorized to Accept** |
| DATE & TIME OF DELIVERY: | **2/4/2026**<br>**2:33 PM** |
| ADDRESS, CITY, AND STATE: | **Northwest Registered Agent, Inc.,**<br>**2108 N. St. # N,**<br>**SACRAMENTO, CA 95816** |

MANNER OF SERVICE:
  Personal Service - By personally delivering copies.

Fee for Service: $ .00
    County:  Sacramento
    Registration No.:  2025-070
APEX  Apex Legal Services
    611 Wilshire Boulevard, Ste 700
    Los Angeles, CA 90017
    (213) 488-1500
    Ref: 123411-2

I declare under penalty of perjury under the laws of the
The State of California that the foregoing information
contained in the return of service and statement of
service fees is true and correct and that this declaration
was executed on  February 6, 2026.

Signature: _____T.Ayers_____
                              Trevor Ayers

**PROOF OF SERVICE**

982(a)(23)[New July 1, 1987]                                                                                              Order#: 64356/General

# EXHIBIT 7

## Feliciano, Katelyn

| | |
|---|---|
| **From:** | Elie-Meyers, Joseph |
| **Sent:** | Tuesday, February 17, 2026 10:05 PM |
| **To:** | Yeremey Krivoshey; Joel Smith |
| **Cc:** | Harper, Jacob; Canner, Heather; Murphet, Felix; Yu, Jennifer; Goitia, Nichele |
| **Subject:** | Notice of Withdrawal of Subpoena, Patel, et al. v. GT's Living Foods, LLC; Misc. Case No. 3:26-mc-80036 |

Mr. Krivoshey and Mr. Smith,

This email is notice of GT Living Foods, LLC's withdraw of the subpoena served on you through Northwest Registered Agent on February 4, 2026 in the matter of *Patel et al. v. GT's Living Foods, LLC*, C.D. Cal. Case No. 2:19-cv-10920-FMO-GJS. In the Declaration of Yeremy Krivoshey that you filed in support of your pending motion to quash, *Patel v. GT's Living Foods LLC*, No. 26-mc-80036-TSH Dkt. 1-1 (N.D. Cal. Feb. 11, 2026), Mr. Krivoshey provided sworn statements describing the history of his involvement in the *Patel* litigation and the nature of his relationship with current *Patel* counsel at Dovel & Luner LLP. *Id.*, paras. 2-10. Because that declaration set out, in sum and substance, the information GT's sought to obtain through the subpoena, and similar to what other subpoenaed parties have agreed in pre-motion conferrals to provide in lieu of deposition testimony or document productions, we are withdrawing GT's subpoena here.

We intend to file notice of withdrawal of the subpoena with the Court tomorrow. Please advise whether you intend to provide notice of withdrawal of your pending motion to quash, which is mooted by the withdrawal of the deposition subpoena. *See Bryant v. Shaeffer*, No. 1:11-CV-00444-AWI, 2015 WL 545934, at *3 (E.D. Cal. Feb. 10, 2015) (withdrawal of the Subpoena renders Movant's motion to quash moot as "there is nothing left to quash"); *Lau v. Mayorkas*, No. 21-CV-04756-TLT, 2024 WL 5700970, at *2 (N.D. Cal. Sept. 11, 2024) (withdrawal of subpoenas moots pending motion to quash); *Cameroon Ass'n of Victims of Ambazonia Terrorism Inc. v. Ambazonia Found. Inc.*, No. CV 20-1115-PA (ASX), 2020 WL 13248961, at *2 (C.D. Cal. May 19, 2020).

Thank you,

Joseph



**Joseph Elie-Meyers**    He/Him/His
**Associate | Davis Wright Tremaine LLP**

**P** 213.655.9611  **E** josepheliemeyers@dwt.com
**A** 350 South Grand Avenue, 27th Floor, Los Angeles, CA 90071

**DWT.COM**  in

1

# EXHIBIT 8

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | **CV 19-10920 FMO (GJSx)** | Date | **June 21, 2024** |
|---|---|---|---|
| Title | **Delaney Sharpe, et al. v. GT's Living Foods, LLC** | | |

Present: The Honorable    Fernando M. Olguin, United States District Judge

| Vanessa Figueroa | None | None |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorney Present for Plaintiff(s):

None Present

Attorney Present for Defendant(s):

None Present

Proceedings:    **(In Chambers) Order Re: Motion for Class Certification [99]**

Having reviewed all the briefing filed with respect to plaintiffs' Motion for Class Certification (Dkt. 99, "Motion"), the court finds that oral argument is not necessary to resolve the Motion, see Fed. R. Civ. P. 78(b); Local Rule 7-15; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001), and concludes as follows.[1]  Although the Court's Order Re: Class Certification Motions required each issue or sub-issue raised by a party to be immediately followed by the opposing party's response, and that all evidentiary objections be made in the joint brief, (see Dkt. 26, Court's Order of March 20, 2020, at 1-3), the parties' papers did not fully comply with these requirements. (See, e.g., Dkt. 113, Joint Brief on Plaintiffs' Motion for Class Certification ("Jt. Br.") at 13-17) (addressing all Rule 23(a) requirements in one fell swoop); (Dkt. 103, Plaintiffs' Supplemental Memorandum in Support of Motion for Class Certification ("Plf. Supp. Br.") at 1-7) (challenging qualifications and reliability of defendant's experts in Supplemental Brief); (Dkt. 104, GT's Supplemental Brief in Opposition to Plaintiffs' Motion for Class Certification 2-6) (challenging plaintiffs' expert's qualifications).  Also, the Motion was filed in August, 2021, (see Dkt. 99, Motion), and since then, the Ninth Circuit has issued several class certification decisions, including Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC, 31 F.4th 651 (9th Cir. 2022) (en banc), that bear on the issues in this case.  Finally, this court has addressed class certification in the consumer food, beverages, and supplements context.  See Capaci v. Sports Research Corp., 2022 WL 1133818 (C.D. Cal. 2022); Lytle v. Nutramax Laboratories, Inc., 2022 WL 1600047 (C.D. Cal. 2022).  Under the circumstances, the court will deny the Motion without prejudice to plaintiffs filing a renewed motion.

In considering whether to file a renewed motion, plaintiffs should note that, in light of Retta v. Millennium Products, Inc.,[2] Case No. CV 15-1801 PSG ("Retta Action"), the court has concerns

---

[1] Capitalization, quotation and alteration marks, and emphasis in record citations may be altered without notation.

[2] Defendant GT's Living Foods, LLC was named Millennium Products between 1995 and 2017.  (See Dkt. 113, Jt. Br. at 6).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | **CV 19-10920 FMO (GJSx)** | Date | **June 21, 2024** |
|---|---|---|---|
| Title | **Delaney Sharpe, et al. v. GT's Living Foods, LLC** | | |

regarding the named plaintiffs'[3] and proposed class counsel, Bursor & Fisher, P.A.'s ("Bursor") ability to adequately represent the class in this case. The Retta Action involved the same allegations regarding the alcohol and sugar levels in defendant's kombucha,[4] asserted the same claims for relief under California and New York law, and was filed by the same attorneys as in this action, i.e., Bursor & Fisher, including Yeremey Krivoshey. (See Retta Action, Dkt. 68, Fifth Amended Complaint ("Retta 5AC") ¶¶ 5, 86-149, 159-171).[5]

On August 22, 2017, Judge Gutierrez granted final approval of the settlement in the Retta Action. See Retta, 2017 WL 5479637, at *1 & *19. In addition to monetary relief, the Retta settlement provided for injunctive relief which, among other things, required defendant to: (1) "[a]dd a warning label that 'the products contain naturally occurring alcohol and should not be consumed by individuals seeking to avoid alcohol due to pregnancy, allergies, sensitivities or religious beliefs[,]'" id., at *2; (Retta Action, Dkt. 103-3, Exh. 1, Stipulation of Class Action Settlement ("Retta Settlement Agreement") at ¶ 47(b)); (2) "regularly test samples from every [s]ubject [p]roduct line (at the time of bottling and the time of expiration) using a third-party laboratory[,]" (Retta Action, Dkt. 103-3, Exh. 1, Retta Settlement Agreement at ¶ 47(c)); Retta, 2017 WL 5479637, at *2; (3) "test the sugar content of multiple product samples, drawn from every [s]ubject [p]roduct line, using a third-party laboratory" every three months, (Retta Action, Dkt. 103-3, Exh. 1, Retta Settlement Agreement at ¶ 47(e)); Retta, 2017 WL 5479637, at *2; and (4) "adopt any new industry wide methodology for testing the alcohol content of kombucha, should one be developed." Retta, 2017 WL 5479637, at *2; (Retta Action, Dkt. 103-3, Exh. 1, Retta Settlement Agreement at ¶ 47(d)).

In seeking approval of the settlement, plaintiffs made several representations to the Retta Court that not only appear to undermine the instant action but also call into question the ability of Bursor to "fairly and adequately represent the interests of the class[,]" see Fed. R. Civ. P. 23(g)(B), i.e., to vigorously and effectively litigate the present action. For example, in Retta, Bursor touted the settlement's "expansive injunctive relief," which included "a warning on its labels that 'the

---

[3] Although the named plaintiffs, who were class members in the Retta Action, (see Dkt. 113, Jt. Br. at 16) (citing responses to interrogatories); Retta v. Millennium Products, Inc. 2017 WL 5479637, *3 (C.D. Cal. 2017) (The class period in Retta was March 11, 2011 to February 26, 2017), appear to be inadequate class representatives, as they would be subject to unique defenses, the majority of the court's concerns relate to counsel. Thus, the court's reference to "plaintiffs" throughout this Order is generally intended to refer to class counsel, specifically Bursor.

[4] This action and Retta involved defendant's Enlightened and Synergy line of kombucha. (See Dkt. 29, First Amended Complaint ("FAC") at ¶ 1 n. 1); (Retta Action, Dkt. 68, 5AC at ¶ 2 n. 1). For ease, the court will refer to the products simply as kombucha or defendant's kombucha.

[5] The Retta 5AC asserted an additional claim for negligent misrepresentation. (See Retta Action, Dkt. 68, 5AC at ¶¶ 150-58).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | **CV 19-10920 FMO (GJSx)** | Date | **June 21, 2024** |
|---|---|---|---|
| Title | **Delaney Sharpe, et al. v. GT's Living Foods, LLC** | | |

products contain naturally occurring alcohol and should not be consumed by individuals seeking to avoid alcohol due to pregnancy, allergies, sensitivities or religious beliefs[.]'" (Retta Action, Dkt. 103-1, Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Approval of Class Action Settlement at 2); (id. at 23) (stating that the settlement "provides precisely the injunctive relief sought in the Complaint" which consists of "the addition of an alcohol warning on the labels of [] Enlightened kombucha products"); Retta, 2017 WL 5479637, at *2. Indeed, a copy of the alcohol warning label that is the subject of this lawsuit was submitted as part of the settlement approval process in the Retta Action. (See Retta Action, Dkt. 136-1, Declaration of George Thomas Dave at ¶ 3 & Exh. 1) (Enlightened Kombucha Label). Yet, in this case, plaintiffs claim that this alcohol warning label is inadequate. (See Dkt. 29, FAC at ¶¶ 1, 5, 8, 11, 14, 25, 32). As defendant notes, plaintiffs "are collaterally attacking the injunctive relief from a class settlement that their counsel negotiated and obtained on their behalf." (Dkt. 113, Jt. Br. at 15) (emphasis omitted). In other words, plaintiffs are challenging the alcohol warning label they negotiated in Retta.

In seeking to challenge the Retta alcohol warning label in this action, plaintiffs contend that they have "put forth evidence that neither they, nor any reasonable consumers, would have purchased Enlightened Kombucha had they known that doing so exposed them to criminality, and if they knew that they could not rely on Defendant's marketing and labeling of the products as non-alcoholic beverages." (Dkt. 113, Jt. Br. at 29) (citing Ex. B at ¶¶ 32, 58-59). According to plaintiffs, "[t]he unwitting consumption of alcoholic beverages is . . . obviously inherently dangerous, and can cause, inter alia, birth defects, accidents, and health complications." (Id.). But it is difficult to give much credence to such contentions since it was Bursor that negotiated and, indeed, advocated for the subject alcohol warning label during the settlement process in the Retta Action. Significantly, an objector to the Retta settlement questioned whether the settlement was fair to minors, and whether it "provide[d] adequate protections to minors going forward" because "Defendant's failure to properly label and advertise its products caused minors to purchase and consume Defendant's alcoholic beverages." (Retta Action, Dkt. 135-1, Declaration of Yeremey Krivoshey in Support of Plaintiffs' Response to Objections to Settlement ("Krivoshey Retta Decl."), Exh. 2 (Objection to Proposed Class Action Settlement ("Retta Obj.") at 2-3). In response to the objection, Bursor argued that the objector "overlooked entirely that the Settlement provides injunctive relief with respect to the alcohol claims[,]" and relied on the warning label – i.e., that "the products contain naturally occurring alcohol and should not be consumed by individuals seeking to avoid alcohol due to pregnancy, allergies, sensitivities or religious beliefs" – it negotiated as part of the settlement and that would be included on defendant's kombucha going forward. (See Retta Action, Dkt. 135, Plaintiffs' Response to Objections to Settlement ("Retta Response") at 8). In overruling the objection, the Retta Court accepted Bursor's representations, stating that "all class members, including minors, stand to receive their fair share of the settlement and the injunctive relief will adequately ensure that consumers are informed about the alcohol content in" defendant's kombucha. Retta, 2017 WL 5479637, at *8.

Moreover, despite the allegations in Retta that defendant's kombucha continues to ferment and produce alcohol after bottling, (see, e.g., Retta Action, Dkt. 68, 5AC at ¶ 29) ("[T]he

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | **CV 19-10920 FMO (GJSx)** | Date | **June 21, 2024** |
|---|---|---|---|
| Title | **Delaney Sharpe, et al. v. GT's Living Foods, LLC** | | |

Enlightened line is a 'raw' and 'unpasteurized' kombucha, necessarily meaning that the beverages continue to ferment and increase in alcohol over time, especially if left unrefrigerated for even short periods of time. Whatever changes Millennium made to its Enlightened line, if any, are ineffective at curbing the accumulation of alcohol in the products past 0.5 percent alcohol by volume through the normal and expected use of the products."), there is nothing in the Retta settlement, (see, generally, Retta Action, Dkt. 103-3, Retta Settlement Agreement), that required defendant to conduct alcohol tests at the point of sale. Instead, Bursor accepted the testing regime (and alcohol disclosure label) that it now challenges in this action.

Finally, with respect to plaintiffs' damages model, Bursor acknowledged in plaintiffs' motion for final approval that a full-refund model is "typically foreclosed" at class certification, in part because beverages provide "benefits in the form of calories, hydration, vitamins, and minerals," (Retta Action, Dkt. 117-1, Motion for Final Approval at 11) (citing In re POM Wonderful LLC, 2014 WL 1225184, *2-3 (C.D. Cal. 2014)), and conceded that defendant's kombucha "contain[s] multiple vitamins, enzymes and probiotics, and provide[s] hydration and calories." (Id.). Notwithstanding that concession, plaintiffs advance a full-refund damages model here. (See Dkt. 113, Jt. Br. at 29-36).

Plaintiffs' responses to defendant's contentions regarding the impact of the Retta Action, (see Dkt. 103, Plf. Supp. at 8-10), are largely unsatisfactory. First, whether the statements made in Retta are admissible is beside the point in addressing the adequacy of counsel. See Fed. R. Civ. P. 23(g)(1)(B) (providing that a court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class"). Second, plaintiffs' argument that it "never agreed that the label disclosure would be sufficient if [defendant] decided to continue selling booze to children,"[6] (Dkt. 103, Plf. Supp. at 10), is non-responsive to the issue here because the record indicates that plaintiffs agreed that the alcohol warning label they negotiated in the Retta Action would be adequate to address claims regarding the sale of defendant's kombucha to minors. As noted above, in addressing an objection that the Retta settlement failed to "provide[] adequate protections to minors going forward[,]" (Retta Action, Dkt. 135-1, Krivoshey Retta Decl, Exh. 2 (Retta Obj.) at 3), Bursor directed the court to the injunctive relief language relating to the "alcohol claims" and set out verbatim the negotiated alcohol warning language.[7]

---

[6] As noted earlier, the Retta settlement provided monetary relief by which class members could elect to receive a cash payment or a product voucher redeemable for free Enlightened Kombucha. (See Retta Action, Dkt. 103-3, Exh. 1, Retta Settlement Agreement at ¶ 45). But nothing in the Retta Settlement Agreement limited the voucher option to class members 21 years of age and over. (See, generally, id. at ¶ 45(b)); (see also id. at Exh. C, Claim Form).

[7] Bursor's reliance on Slusher v. Big Lots Stores, Inc., 2018 WL 10164064 (N.D. Cal. 2018) is misplaced. In that case, the defendant argued that the doctrine of claim splitting barred a subsequently filed class action. See id. at *1-2. Significantly, Slusher involved simultaneous class actions, see id. at *1, rather than the situation here, i.e., where class counsel negotiated label

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | **CV 19-10920 FMO (GJSx)** | Date | **June 21, 2024** |
|---|---|---|---|
| Title | **Delaney Sharpe, et al. v. GT's Living Foods, LLC** | | |

(Retta Action, Dkt. 135, Retta Response at 8).

Third, plaintiffs contend that they had "hoped that the new formulation" of using kiwi juice instead of cane sugar in defendant's kombucha coupled with the requirement for future testing "would have led to corrective behavior." (See Dkt. 103, Plf. Supp. at 9). Plaintiffs also contend that "no claims in Retta (of either Plaintiffs or Class Members) are being re-litigated here" because "[t]he class period in Retta ended on February 26, 2017." (Id.). Plaintiffs' contentions are unpersuasive.

As an initial matter, plaintiffs' contentions regarding the temporal scope of the class and the claims that are (or are not) being litigated in this action may be accurate as to plaintiffs' damages claims, but it does not apply to the injunctive relief issued by the Retta Court.[8] Indeed, plaintiffs acknowledge that "[t]he Retta settlement had no requirement for how long [defendant] needed to use the proposed labeling[.]" (Id. at 9). In other words, the injunctive relief issued by the Retta Court was permanent. Putting aside the fact that the alcohol warning label Bursor negotiated has been used by defendant since the Retta settlement, it appears that plaintiffs simply aren't satisfied with the injunctive relief they negotiated and had approved by the Retta Court. But when a court issues permanent injunctive relief that a party believes is insufficient or needs to be modified (i.e., if the new formulation of defendant's kombucha turned out to be insufficient or inadequate), the remedy isn't to file a new action – before a different judge – seeking to challenge the injunctive relief. Rather, the remedy is to seek to modify or challenge the injunctive relief through a proper motion filed with the judge who issued the injunctive relief,[9] cf., e.g., Flores v. Lynch, 828 F.3d 898, 905 (9th Cir. 2016) (noting use of motion to enforce settlement), or, seek to have the case transferred as a related case to the judge who issued the injunctive relief.

---

language in a prior action that it subsequently contends is inadequate in a subsequent action.

[8] The court is not persuaded by plaintiffs' contention that "the main benefits of the Retta settlement was the $8.25 million cash consideration." (Dkt. 103, Plt. Supp. at 9). A review of the final approval order and the underlying settlement documents in the Retta Action indicate that the injunctive relief was a significant part of the Retta settlement and, indeed, some of the injunctive relief was intended to address claims in a related class action. See Retta, 2017 WL 5479637, at *2 & n. 1 (setting forth injunctive relief provisions and noting that one provision is intended to address claim from related class action).

[9] This procedure, arguably, would not apply to a non-party or non-class member to the Retta case. However, a case filed by a non-party or non-class member would still be subject to transfer, as a related case, to the Retta Court which issued the subject injunctive relief. See L.R. 83-1.3.1 (providing that a notice of related case shall be filed "whenever two or more civil cases filed in this District[] . . . arise from the same or a closely related transaction, happening, or event" or "call for determination of the same or substantially related or similar questions of law and fact[.]").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | **CV 19-10920 FMO (GJSx)** | Date | **June 21, 2024** |
|---|---|---|---|
| Title | **Delaney Sharpe, et al. v. GT's Living Foods, LLC** | | |

The issues and concerns raised in this Order perhaps could have been avoided if Bursor had simply filed a Notice of Related Case pursuant to Local Rule 83-1.3 as to the Retta Action at the time it filed this action. Instead, Bursor filed a Local Rule 83-1.3 Notice of Related Case (Dkt. 8), as to the then-pending action, Tortilla Factory, LLC v. GT's Living Foods, LLC, Case No. CV 17-7539 FMO, contending that this case contained largely the same allegations as in Tortilla Factory. (Id. at 1). While Bursor acknowledged that Tortilla Factory was a competitor case, it claimed that discovery and motion practice would cover many overlapping issues, and that it "would be far more efficient for the two cases to be heard by the same judge." (Id. at 2). However, given that the Retta Court approved the alcohol warning label that is being challenged here, see Retta, 2017 WL 5479637, at *19, and that Court "retain[ed] exclusive jurisdiction over Defendant[] and the Settlement Class Members for all matters relating to this litigation, including the . . . interpretation, effectuation, or enforcement of the Settlement Agreement and th[e] Order[,]" id., counsel should have filed a notice of related case as to the Retta Action which, like the instant case, was a consumer case. Though Retta was closed at the time the notice of related case was filed, nothing in the applicable Local Rule prohibits the filing of a notice of related case with respect to a closed case. See, generally, L.R. 83-1.3.

**This Order is not intended for publication. Nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

Based on the foregoing, IT IS ORDERED THAT:

1. Plaintiffs' Motion for Class Certification **(Document No. 99)** is **denied without prejudice**.

2. No later than **August 22, 2024**, plaintiffs shall file a renewed motion for class certification.

3. With respect to any renewed motion, the parties shall: (1) apply updated applicable case law; (2) strictly comply with the Court's Order Re: Motions for Class Certification (Dkt. 26); (3) address whether plaintiffs and class counsel, including Bursor & Fisher, are adequate representatives and class counsel; (4) address whether res judicata and/or judicial estoppel apply and at what stage, i.e., the class certification or the merits stage of the litigation; and (5) address whether a full refund damages model is viable in light of the court's rulings in other cases, given that this case does not involve the sale of pills or supplements and, if such a model is not available, whether this is an issue for the class certification or the merits stage of litigation.

| | 00 | : | 00 |
|---|---|---|---|
| Initials of Preparer | | vdr | |